Tina Wolfson (SBN 174806)
*twolfson@ahdootwolfson.com*
Theodore W. Maya (SBN 223242)
*tmaya@ahdootwolfson.com*
Deborah De Villa (SBN 312564)
*ddevilla@ahdootwolfson.com*
Alyssa D. Brown (SBN 301313)
*abrown@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, California 91505
Tel. (310) 474.9111
Fax: (310) 474.8585

Melissa Clark (*pro hac vice to be filed*)
*mclark@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
521 5th Avenue, 17th Floor
New York, NY 10175
Telephone: (917) 336-0171
Facsimile: (917) 336-0177

*Counsel for Plaintiffs and the Proposed Classes*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: TEA DATING ADVICE DATA BREACH LITIGATION<br><br>This Document Relates to: Case No. 3:25-cv-06325 | Case No. 3:25-cv-06321<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Jane Doe, Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, Jane Doe 6, Jane Doe 7, Jane Doe 8, Jane Doe 9, Jane Doe 10, Jane Doe 11, Jane Doe 12, Jane Doe 13, Jane Doe 14,  Doe 15, Jane Doe 16, Jane Doe 17, Jane Doe 18, Jane Doe 19, and Jane Doe 20 ("Plaintiffs"), individually and on behalf of all others similarly situated, upon personal knowledge of facts pertaining to themselves and on information and belief as to all other matters, by and through undersigned counsel, bring this class action complaint against defendants Tea Dating Advice Inc. ("Tea") and X Corp. ("X") (collectively, "Defendants"):

## INTRODUCTION

1.      This case arises from one of the most catastrophic and ironic data breaches in the digital age. A "safety" app designed to protect women exposed their most sensitive personal information to the darkest corners of the internet. Tea, which marketed itself as a sanctuary where women could anonymously warn each other about dangerous men, instead became the very threat it promised to protect against.

2.      As part of its purported safety net for women, Tea required each potential user to verify her identity by requiring her to upload a government ID and submit a "selfie," along with her personal information, upon signing up for the app.[1]

3.      On July 25, 2025, the unthinkable happened. Tea's entire database of user verification data—72,000 images including government-issued IDs—sat completely exposed on the internet, accessible to anyone with a web browser. *See* Zack Whittaker, *Women's Safety App Tea Breached, Exposing 72,000 User Images*, TechCrunch (July 26, 2025), https://techcrunch.com/2025/07/26/dating-safety-app-tea-breached-exposing-72000-user-images/; *see also* Joseph Cox, *Women Dating Safety App 'Tea' Breached, Users' IDs Posted to 4chan*, 404 Media (July 25, 2025), https://www.404media.co/women-dating-safety-app-tea-breached-users-ids-posted-to-4chan/.      No password required. No authentication needed. Just click and download the sensitive personal information of women who trusted Tea with their safety.

---

[1] The Terms of Use in effect from December 28, 2022, through August 10, 2025, required a potential user to submit her "location, birth date, photo and ID photo" to create an account. *See* archived version of Tea's Terms of Use effective Dec. 28, 2022, *Terms of Use*, Tea Dating Advice, https://www.teaforwomen.com/terms
[https://web.archive.org/web/20250729184054/https://www.teaforwomen.com/terms]

AMENDED CLASS ACTION COMPLAINT

4.      The breach was discovered not by Tea's security team, but by anonymous users on 4chan—the notorious imageboard known for harassment campaigns against women. *See* Caitlin Dewey, *Absolutely Everything You Need to Know to Understand 4chan, The Internet's Own Bogeyman* (Sept. 25, 2014),   https://www.washingtonpost.com/news/the-intersect/wp/2014/09/25/absolutely-everything-you-need-to-know-to-understand-4chan-the-internets-own-bogeyman/.

5.      Within hours, these users had created automated scripts to systematically download every government ID, every verification selfie, and other personally identifiable information (PII). "DRIVERS LICENSES AND FACE PICS! GET THE FUCK IN HERE BEFORE THEY SHUT IT DOWN!" read the original post that set off a digital feeding frenzy. Cox, *supra*; *see also* Kevin Collier and Angela Yang, *Hackers Leak 13,000 User Photos and IDs from the Tea App*, NBC News (July 25, 2025), https://www.nbcnews.com/tech/social-media/tea-app-hacked-13000-photos-leaked-4chan-call-action-rcna221139.

6.      The data didn't stop at 4chan. Posts on Defendant X Corp.'s platform (formerly Twitter) amplified the breach, with users creating searchable databases linking women's real identities to their anonymous posts. "The drivers licenses leaked today from the tea app have been uploaded to a searchable map…. this may be the worst PII leak I've ever seen lol," one X post boasted. What was meant to be a shield for vulnerable women became a weapon in the hands of those who would do them harm.

7.      Days later, the breach was discovered to be far more extensive than initially reported—exposing not just 72,000 images but also over 1.1 million private messages between users, containing intimate discussions about reproductive health, relationships, and personal safety. *See* Lauren Forristal, *Tea App Disables DMs After Second Data Breach Exposed Over a Million Private Messages*, TechCrunch (July   29,   2025),   https://techcrunch.com/2025/07/29/tea-apps-data-breach-gets-much-worse-exposing-over-a-million-private-messages/.

8.      For Plaintiffs and tens of thousands of women like them, the nightmare was just beginning. Plaintiffs joined Tea for one simple reason: to anonymously warn other women, and be warned themselves, about the dangerous or problematic men in their communities. The app promised them that anonymity. It promised them safety. It promised to delete their verification data. Tea broke every one of those promises.

AMENDED CLASS ACTION COMPLAINT

9.      The exposed data created a perfect kit for identity theft: high-resolution government IDs showing full names and addresses, and selfies, many including EXIF location information, too, among other sensitive and private information. In addition, the selfies Tea collected for "verification" contained enough detail for sophisticated facial recognition. Bad actors could now use these images to create deepfakes or bypass security systems.

10.     For women who used Tea to report dangerous men, the breach didn't just compromise their identities and financial security—it exposed them to potential physical and psychological danger from the very people they were warning others about, with maps of Tea users floating around the web. For survivors of sexual assault, mental abuse, and physical abuse, who came to Tea to protect themselves from further harm, the breach and subsequent online PII proliferation and harassing chatter put them at personal risk and forced them to relive their traumas.

11.     How did this happen? Tea stored its most sensitive user data in a Google Firebase storage bucket configured for completely public access. *See* Google Cloud, *Understand Firebase Security Rules for Cloud Storage*, Firebase Documentation, https://firebase.google.com/docs/storage/security (last visited July 28, 2025).

12.     This wasn't a sophisticated hack. This was the digital equivalent of leaving the bank vault door wide open.

13.     The catastrophic result is predictable. Cybersecurity experts have long warned that misconfigured Firebase buckets are a common and dangerous vulnerability. *See*, *e.g.*, Dwayne McDaniel, *Misconfigurations in Google Firebase Lead to Over 19.8 Million Leaked Secrets* (Mar. 20, 2024), GitGuardian, https://blog.gitguardian.com/misconfigurations-in-google-firebase-lead-to-over-19-8-million-leaked-secrets/. Any competent developer knows to check these settings. Tea didn't bother.

14.     When Tea finally acknowledged the breach—not through direct correspondence to affected users, but through an Instagram post—it claimed it kept the data "in compliance with law enforcement requirements." *FAQs*, Tea Dating Advice, Inc., https://www.teaforwomen.com/cyberincident; Tea Dating Advice, Inc. (@theteapartygirls), Instagram (July 25, 2025), https://www.instagram.com/p/DMjRl4CPE0z/?igsh=cnVvem5ndWl6a2Fk; *see also July 25th, 2025 Post by the Official Tea App Instagram Page*, Know Your Meme,

AMENDED CLASS ACTION COMPLAINT

1  https://knowyourmeme.com/photos/3108083-the-tea-app-data-leak. But this was simply data in an

2  unsecured bucket, waiting to be discovered by anyone who looked.

3      15.    Despite this acknowledgement, Tea did not begin to notify its users about the Data Breach

4  for an entire month. Even then, Tea notified only a subset of about 4,000 users whose driver's license,

5  passport number, or other government identification number were involved.

6      16.    Tea did not send its notice to all women affected by the breach, including the women who

7  had their private messages disclosed.

8      17.    Further, even for the users it did notify, Tea offered only a meager two-year membership

9  for an identity monitoring service. Two years of identity monitoring—which was not offered until an

10  entire month after user's sensitive information was exposed—is not sufficient to combat the permanent

11  nature of the exposure of sensitive PII. Tea's offer was too little, too late.

12      18.    This lawsuit seeks to hold all responsible parties accountable—not just Tea for its

13  catastrophic security failures, but also X Corp. for allowing the widespread dissemination of stolen

14  personal data on its platform.

15      19.    Plaintiffs bring this action individually and on behalf of all Tea users whose personal

16  information was exposed in the breach, seeking damages, restitution, and injunctive relief.

17  **PARTIES**

18  **California Plaintiffs**

19  **Jane Doe**

20      20.    Plaintiff Jane Doe is a natural person, citizen of California, and resident of a small

21  community in Northern California. To protect her safety and privacy, Plaintiff proceeds under a

22  pseudonym. Given the nature of this breach and the sensitive information exposed, Plaintiff has a

23  substantial privacy interest that outweighs the public's interest in knowing her identity.

24      21.    Plaintiff began using the Tea app prior to the Data Breach. Plaintiff was required to provide,

25  and did provide, her sensitive PII to Defendant Tea in order to use the Tea app. Plaintiff was also required

26  to upload her government ID. As a result of the Data Breach, Plaintiffs' PII, including a photo of her

27  driver's license, was exposed to unauthorized third parties.

28

22. Plaintiff downloaded and joined Tea because she wanted to warn other women about a man who allegedly sexually assaulted two women in her small community in Northern California. Plaintiff specifically chose Tea because it promised anonymous reporting—she could fulfill her moral obligation to warn others without exposing herself to potential retaliation. In order to use Tea, Plaintiff was required to submit a photo of her driver's license and additional PII through the Tea app, which she did. That photograph and information has now been released as a result of this Data Breach. Plaintiff is afraid the man in question will soon find out that Plaintiff posted about his alleged assault on the Tea app. Accordingly, Plaintiff is in fear for her safety as a result of this Data Breach.

23. As a direct result of Tea's failures and the subsequent distribution of her data through social media, Plaintiff has suffered and continues to suffer significant harm. She has spent and will spend considerable time and money on protective measures, including identity theft protection.

24. She lives in constant fear that her exposed driver's license will be used for identity theft, that her data will be used for nefarious purposes, or worst of all, that the man she reported will find out she exposed him on the app and seek retaliation.

25. Further, plaintiff is aware that bad actors are proliferating the PII obtained from Tea through the Data Breach on social media, exposing and trolling Tea users as a group as well as individually. Plaintiff lives in fear of embarrassment and retaliation by these bad actors, and worries that, if exposed, she will suffer reputational damage as well as loss of income. With Tea, anonymity was her only protection. Defendants stole that from her.

**Jane Doe 2**

26. Plaintiff Jane Doe 2 is a natural person and citizen of California. To protect her safety and privacy, Plaintiff proceeds under a pseudonym. Given the nature of this breach and the sensitive information exposed, Plaintiff has a substantial privacy interest that outweighs the public's interest in knowing her identity.

27. Plaintiff began using the Tea app prior to the Data Breach. Plaintiff was required to provide, and did provide, her sensitive PII to Defendant Tea in order to use the Tea app. Plaintiff was also required to upload her government ID. As a result of the Data Breach, Plaintiffs' PII, including a photo of her driver's license, was exposed to unauthorized third parties.

AMENDED CLASS ACTION COMPLAINT

28.    Plaintiff downloaded and joined Tea because she wanted to warn other women about her child's father, who is a serial cheater and who neglects his parental obligations. Plaintiff specifically chose Tea because it promised anonymous reporting—she could fulfill her moral obligation to warn others without exposing herself to potential retaliation. In order to use Tea, Plaintiff was required to submit a photo of her driver's license and additional PII through the Tea app, which she did. That photograph and information has now been released as a result of this Data Breach. Although she deleted her post prior to the breach, out of fear of discovery and retaliation, Plaintiff is afraid the man in question will soon find out that Plaintiff posted about him on the Tea app. Accordingly, Plaintiff is in fear for her safety as a result of this Data Breach.

29.    As a direct result of Tea's failures and the subsequent distribution of her data through social media, Plaintiff has suffered and continues to suffer significant harm. She has spent and will spend considerable time and money on protective measures, including identity theft protection. She lives in constant fear that her exposed driver's license will be used for identity theft, that her data will be used for nefarious purposes, or worst of all, that the man she reported will find out she exposed him on the app and seek retaliation.

30.    Further, plaintiff is aware that bad actors are proliferating the PII obtained from Tea through the Data Breach on social media, exposing and trolling Tea users as a group as well as individually. Plaintiff lives in fear of embarrassment and retaliation by these bad actors, and worries that, if exposed, she will suffer reputational damage as well as loss of income. With Tea, anonymity was her only protection. Defendants stole that from her.

**Jane Doe 3**

31.    Plaintiff Jane Doe 3 is a natural person and citizen of California. To protect her safety and privacy, Plaintiff proceeds under a pseudonym. Given the nature of this breach and the sensitive information exposed, Plaintiff has a substantial privacy interest that outweighs the public's interest in knowing her identity.

32.    Plaintiff began using the Tea app prior to the Data Breach. Plaintiff was required to provide, and did provide, her sensitive PII to Defendant Tea in order to use the Tea app. Plaintiff was also required

AMENDED CLASS ACTION COMPLAINT

to upload her government ID. As a result of the Data Breach, Plaintiffs' PII, including a photo of her driver's license, was exposed to unauthorized third parties.

33.     Plaintiff downloaded and joined Tea because she was dating and wanted to avoid dangerous situations with men who had a history of cheating or violence. Plaintiff specifically chose Tea because it promised anonymity. In order to use Tea, Plaintiff was required to submit a photo of her driver's license and additional PII through the Tea app, which she did. That photograph and information has now been released as a result of this Data Breach. Plaintiff is afraid for her safety due to the significant threats of violence that have been circulating on social media directed towards the users of the Tea app.

34.     As a direct result of Tea's failures and the subsequent distribution of her data through social media, Plaintiff has suffered and continues to suffer significant harm. She has spent and will spend considerable time and money on protective measures, including identity theft protection. She lives in constant fear that her exposed driver's license will be used for identity theft, or that her data will be used for nefarious purposes.

35.     Further, plaintiff is aware that bad actors are proliferating the PII obtained from Tea through the Data Breach on social media, exposing and trolling Tea users as a group as well as individually. Plaintiff lives in fear of embarrassment and retaliation by these bad actors, and worries that, if exposed, she will suffer reputational damage as well as loss of income. With Tea, anonymity was her only protection. Defendants stole that from her.

**Jane Doe 20**

36.     Plaintiff Jane Doe 20 is a natural person and citizen of California. To protect her safety and privacy, Plaintiff proceeds under a pseudonym. Given the nature of this breach and the sensitive information exposed, Plaintiff has a substantial privacy interest that outweighs the public's interest in knowing her identity.

37.     Plaintiff began using the Tea app prior to the Data Breach. Plaintiff was required to provide, and did provide, her sensitive PII to Defendant Tea in order to use the Tea app.  Plaintiff was also required to upload her government ID. As a result of the Data Breach, Plaintiffs' PII, including a photo of her driver's license, was exposed to unauthorized third parties.

AMENDED CLASS ACTION COMPLAINT

38.    Plaintiff downloaded and joined Tea because she wanted to warn other women about her experiences with problematic men. Plaintiff specifically chose Tea because it promised anonymous reporting—she could fulfill her moral obligation to warn others without exposing herself to potential retaliation. In order to use Tea, Plaintiff was required to submit a photo of her driver's license and additional PII through the Tea app, which she did. That photograph and information has now been released as a result of this Data Breach. Plaintiff has already been contacted by one individual who claims to have gotten her phone number from the dark web, and Plaintiff is afraid other men will soon find out that Plaintiff posted on the Tea app. Accordingly, Plaintiff is in fear for her safety as a result of this Data Breach

39.    As a direct result of Tea's failures and the subsequent distribution of her data through social media, Plaintiff has suffered and continues to suffer significant harm. She has spent and will spend considerable time and money on protective measures, including identity theft protection. She lives in constant fear that her exposed driver's license will be used for identity theft, or that her data will be used for nefarious purposes.

40.    Further, plaintiff is aware that bad actors are proliferating the PII obtained from Tea through the Data Breach on social media, exposing and trolling Tea users as a group as well as individually. Plaintiff lives in fear of embarrassment and retaliation by these bad actors, and worries that, if exposed, she will suffer reputational damage as well as loss of income. With Tea, anonymity was her only protection. Defendants stole that from her.

**Colorado Plaintiffs**

**Jane Doe 4**

41.    Plaintiff Jane Doe 4 is a natural person and citizen of Colorado. To protect her safety and privacy, Plaintiff proceeds under a pseudonym. Given the nature of this breach and the sensitive information exposed, Plaintiff has a substantial privacy interest that outweighs the public's interest in knowing her identity.

42.    Plaintiff signed up for the Tea App prior to February 2024. Plaintiff was required to provide, and did provide, her sensitive PII to Defendant Tea in order to use the Tea app. Plaintiff was also

AMENDED CLASS ACTION COMPLAINT

required to upload her government ID. As a result of the Data Breach, Plaintiff's PII, including a photo of her driver's license, was exposed to unauthorized third parties.

43.    Plaintiff downloaded and joined Tea because she was dating and wanted to avoid dangerous situations with men who had a history of cheating or violence. Plaintiff specifically chose Tea because it promised anonymity. In order to use Tea, Plaintiff was required to submit a photo of her driver's license and additional PII through the Tea app, which she did. That photograph and information has now been released as a result of this Data Breach. Plaintiff is afraid that being exposed as a Tea app user will result in violence and/or harassment within her community. Accordingly, Plaintiff is in fear for her safety as a result of this Data Breach.

44.    As a direct result of Tea's failures and the subsequent distribution of her data through social media, Plaintiff has suffered and continues to suffer significant harm. She has spent and will spend considerable time and money on protective measures, including freezing her credit and obtaining identity protection services. She lives in constant fear that her exposed driver's license will be used for identity theft, that her data will be used for nefarious purposes.

45.    Further, plaintiff is aware that bad actors are proliferating the PII obtained from Tea through the Data Breach on social media, exposing and trolling Tea users as a group as well as individually. Plaintiff lives in fear of embarrassment and retaliation by these bad actors, and worries that, if exposed, she will suffer reputational damage as well as loss of income. With Tea, anonymity was her only protection. Defendants stole that from her.

**Jane Doe 5**

46.    Plaintiff Jane Doe 5 is a natural person and citizen of Colorado. To protect her safety and privacy, Plaintiff proceeds under a pseudonym. Given the nature of this breach and the sensitive information exposed, Plaintiff has a substantial privacy interest that outweighs the public's interest in knowing her identity.

47.    Plaintiff began using the Tea app prior to February 2024. Plaintiff was required to provide, and did provide, her sensitive PII to Defendant Tea in order to use the Tea app. Plaintiff was also required to upload her government ID. As a result of the Data Breach, Plaintiffs' PII, including a photo of her driver's license, was exposed to unauthorized third parties.

AMENDED CLASS ACTION COMPLAINT

48.     Plaintiff downloaded and joined Tea because she was dating and wanted to avoid dangerous situations with men who had a history of cheating or violence. She additionally wanted to warn other women about her ex-husband, who was emotionally, physically, and financially abusive, and unfaithful. Plaintiff specifically chose Tea because it promised anonymous reporting. In order to use Tea, Plaintiff was required to submit a photo of her driver's license and additional PII through the Tea app, which she did. That photograph and information has now been released as a result of this Data Breach. Plaintiff is afraid the men she posted about, including her ex-husband, who already has contempt charges for harassment and stalking, will find out that she posted about them. Accordingly, Plaintiff is in fear for her safety as a result of this Data Breach.

49.     As a direct result of Tea's failures and the subsequent distribution of her data through social media, Plaintiff has suffered and continues to suffer significant harm. She lives in constant fear that her exposed driver's license will be used for identity theft, that her data will be used for nefarious purposes, or worst of all, that the men she reported will find out she exposed them on the app and seek retaliation.

50.     Further, plaintiff is aware that bad actors are proliferating the PII obtained from Tea through the Data Breach on social media, exposing and trolling Tea users as a group as well as individually. Plaintiff lives in fear of embarrassment and retaliation by these bad actors, and worries that, if exposed, she will suffer reputational damage as well as loss of income. With Tea, anonymity was her only protection. Defendants stole that from her.

**Illinois Plaintiffs**

**Jane Doe 6**

51.     Plaintiff Jane Doe 6 is a natural person and citizen of Illinois. To protect her safety and privacy, Plaintiff proceeds under a pseudonym. Given the nature of this breach and the sensitive information exposed, Plaintiff has a substantial privacy interest that outweighs the public's interest in knowing her identity.

52.     Plaintiff began using the Tea app prior to the Data Breach. Plaintiff was required to provide, and did provide, her sensitive PII to Defendant Tea in order to use the Tea app. Plaintiff was also required to upload her government ID. As a result of the Data Breach, Plaintiffs' PII, including a photo of her Illinois Identification Card, was exposed to unauthorized third parties.

AMENDED CLASS ACTION COMPLAINT

53.     Plaintiff downloaded and joined Tea because she wanted to put herself at ease regarding the men she met during online dating. Plaintiff specifically chose Tea because it promised anonymity—she could seek out information about men without fear of retaliation. In order to use Tea, Plaintiff was required to submit a photo of her Illinois Identification Card and additional PII through the Tea app, which she did. That photograph and information has now been released as a result of this Data Breach. Plaintiff is afraid for her safety due to the significant threats of violence that have been circulating on social media directed towards the users of the Tea app.

54.     As a direct result of Tea's failures and the subsequent distribution of her data through social media, Plaintiff has suffered and continues to suffer significant harm. She has spent and will spend considerable time and money on protective measures, including identity theft protection. She lives in constant fear that her exposed Illinois Identification Card will be used for identity theft, or that her data will be used for nefarious purposes.

55.     Further, plaintiff is aware that bad actors are proliferating the PII obtained from Tea through the Data Breach on social media, exposing and trolling Tea users as a group as well as individually. Plaintiff lives in fear of embarrassment and retaliation by these bad actors, and worries that, if exposed, she will suffer reputational damage as well as loss of income. With Tea, anonymity was her only protection. Defendants stole that from her.

**Jane Doe 7**

56.     Plaintiff Jane Doe 7 is a natural person and citizen of Illinois. To protect her safety and privacy, Plaintiff proceeds under a pseudonym. Given the nature of this breach and the sensitive information exposed, Plaintiff has a substantial privacy interest that outweighs the public's interest in knowing her identity.

57.     Plaintiff began using the Tea app prior to the Data Breach. Plaintiff was required to provide, and did provide, her sensitive PII to Defendant Tea in order to use the Tea app. Plaintiff was also required to upload her government ID. As a result of the Data Breach, Plaintiffs' PII, including a photo of her Illinois Identification Card, was exposed to unauthorized third parties.

58.     Plaintiff downloaded and joined Tea because she wanted to put herself at ease regarding the men she met during online dating. Plaintiff specifically chose Tea because it promised anonymity—

AMENDED CLASS ACTION COMPLAINT

she could seek out information about men without fear of retaliation. In order to use Tea, Plaintiff was required to submit a photo of her Illinois Identification Card and additional PII through the Tea app, which she did. That photograph and information has now been released as a result of this Data Breach. Plaintiff is afraid for her safety due to the significant threats of violence that have been circulating on social media directed towards the users of the Tea app.

59.    As a direct result of Tea's failures and the subsequent distribution of her data through social media, Plaintiff has suffered and continues to suffer significant harm. She has spent and will spend considerable time and money on protective measures, including identity theft protection. She lives in constant fear that her exposed Illinois Identification Card will be used for identity theft, or that her data will be used for nefarious purposes.

60.    Further, plaintiff is aware that bad actors are proliferating the PII obtained from Tea through the Data Breach on social media, exposing and trolling Tea users as a group as well as individually. Plaintiff lives in fear of embarrassment and retaliation by these bad actors, and worries that, if exposed, she will suffer reputational damage as well as loss of income. With Tea, anonymity was her only protection. Defendants stole that from her.

**Jane Doe 8**

61.    Plaintiff Jane Doe 8 is a natural person and citizen of Illinois. To protect her safety and privacy, Plaintiff proceeds under a pseudonym. Given the nature of this breach and the sensitive information exposed, Plaintiff has a substantial privacy interest that outweighs the public's interest in knowing her identity.

62.    Plaintiff began using the Tea app prior to the Data Breach. Plaintiff was required to provide, and did provide, her sensitive PII to Defendant Tea in order to use the Tea app. Plaintiff was also required to upload her government ID. As a result of the Data Breach, Plaintiffs' PII, including a photo of her driver's license, was exposed to unauthorized third parties.

63.    Plaintiff downloaded and joined Tea because she wanted to put herself at ease regarding the men she met during online dating. Plaintiff specifically chose Tea because it promised anonymity— she could seek out information about men without fear of retaliation. In order to use Tea, Plaintiff was required to submit a photo of her driver's license and additional PII through the Tea app, which she did.

- 12 -

AMENDED CLASS ACTION COMPLAINT

That photograph and information has now been released as a result of this Data Breach. Plaintiff is afraid for her safety due to the significant threats of violence that have been circulating on social media directed towards the users of the Tea app.

64. As a direct result of Tea's failures and the subsequent distribution of her data through social media, Plaintiff has suffered and continues to suffer significant harm. She has spent and will spend considerable time and money on protective measures, including identity theft protection. She lives in constant fear that her exposed driver's license will be used for identity theft, or that her data will be used for nefarious purposes.

65. Further, plaintiff is aware that bad actors are proliferating the PII obtained from Tea through the Data Breach on social media, exposing and trolling Tea users as a group as well as individually. Plaintiff lives in fear of embarrassment and retaliation by these bad actors, and worries that, if exposed, she will suffer reputational damage as well as loss of income. With Tea, anonymity was her only protection. Defendants stole that from her.

**Jane Doe 9**

66. Plaintiff Jane Doe 9 is a natural person and citizen of Illinois. To protect her safety and privacy, Plaintiff proceeds under a pseudonym. Given the nature of this breach and the sensitive information exposed, Plaintiff has a substantial privacy interest that outweighs the public's interest in knowing her identity.

67. Plaintiff began using the Tea app prior to the Data Breach. Plaintiff was required to provide, and did provide, her sensitive PII to Defendant Tea in order to use the Tea app. Plaintiff was also required to upload her government ID. As a result of the Data Breach, Plaintiffs' PII, including a photo of her driver's license, was exposed to unauthorized third parties.

68. Plaintiff downloaded and joined Tea because she wanted to put herself at ease regarding the men she met during online dating. Plaintiff specifically chose Tea because it promised anonymity—she could seek out information about men without fear of retaliation. In order to use Tea, Plaintiff was required to submit a photo of her driver's license and additional PII through the Tea app, which she did. That photograph and information has now been released as a result of this Data Breach. Plaintiff is afraid

for her safety due to the significant threats of violence that have been circulating on social media directed towards the users of the Tea app.

69. As a direct result of Tea's failures and the subsequent distribution of her data through social media, Plaintiff has suffered and continues to suffer significant harm. She has spent and will spend considerable time and money on protective measures, including identity theft protection. She lives in constant fear that her exposed driver's license will be used for identity theft, or that her data will be used for nefarious purposes.

70. Further, plaintiff is aware that bad actors are proliferating the PII obtained from Tea through the Data Breach on social media, exposing and trolling Tea users as a group as well as individually. Plaintiff lives in fear of embarrassment and retaliation by these bad actors, and worries that, if exposed, she will suffer reputational damage as well as loss of income. With Tea, anonymity was her only protection. Defendants stole that from her.

**Jane Doe 10**

71. Plaintiff Jane Doe 10 is a natural person and citizen of Illinois. To protect her safety and privacy, Plaintiff proceeds under a pseudonym. Given the nature of this breach and the sensitive information exposed, Plaintiff has a substantial privacy interest that outweighs the public's interest in knowing her identity.

72. Plaintiff began using the Tea app prior to the Data Breach. Plaintiff was required to provide, and did provide, her sensitive PII to Defendant Tea in order to use the Tea app. Plaintiff was also required to upload her government ID. As a result of the Data Breach, Plaintiffs' PII, including a photo of her driver's license, was exposed to unauthorized third parties.

73. Plaintiff downloaded and joined Tea because she wanted to put herself at ease regarding the men she met during online dating. Plaintiff specifically chose Tea because it promised anonymity—she could seek out information about men without fear of retaliation. In order to use Tea, Plaintiff was required to submit a photo of her driver's license and additional PII through the Tea app, which she did. That photograph and information has now been released as a result of this Data Breach. Plaintiff is afraid for her safety due to the significant threats of violence that have been circulating on social media directed towards the users of the Tea app.

AMENDED CLASS ACTION COMPLAINT

74.     As a direct result of Tea's failures and the subsequent distribution of her data through social media, Plaintiff has suffered and continues to suffer significant harm. She has spent and will spend considerable time and money on protective measures, including identity theft protection. She lives in constant fear that her exposed driver's license will be used for identity theft, or that her data will be used for nefarious purposes.

75.     Further, plaintiff is aware that bad actors are proliferating the PII obtained from Tea through the Data Breach on social media, exposing and trolling Tea users as a group as well as individually. Plaintiff lives in fear of embarrassment and retaliation by these bad actors, and worries that, if exposed, she will suffer reputational damage as well as loss of income. With Tea, anonymity was her only protection. Defendants stole that from her.

**New York Plaintiff**

**Jane Doe 11**

76.     Plaintiff Jane Doe 11 is a natural person and citizen of New York. To protect her safety and privacy, Plaintiff proceeds under a pseudonym. Given the nature of this breach and the sensitive information exposed, Plaintiff has a substantial privacy interest that outweighs the public's interest in knowing her identity.

77.     Plaintiff began using the Tea app prior to the Data Breach. Plaintiff was required to provide, and did provide, her sensitive PII to Defendant Tea in order to use the Tea app. Plaintiff was also required to upload her government ID. As a result of the Data Breach, Plaintiffs' PII, including a photo of her New York State Identification Card, was exposed to unauthorized third parties.

78.     Plaintiff downloaded and joined Tea in order to obtain information and feel safer when dating online. Plaintiff specifically chose Tea because it promised anonymous reporting. She had previously used a different social media platform to warn others about a man she had dated, but was then harassed by the man's family/friends when they found out she posted about him. In order to use Tea, Plaintiff was required to submit a photo of her New York State Identification Card and additional PII through the Tea app, which she did. That photograph and information has now been released as a result of this Data Breach. She is afraid for her safety due to the significant threats of violence that have been circulating on social media directed towards the users of the Tea app.

AMENDED CLASS ACTION COMPLAINT

79.     As a direct result of Tea's failures and the subsequent distribution of her data through social media, Plaintiff has suffered and continues to suffer significant harm. She has spent and will spend considerable time and money on protective measures, including identity theft protection. She lives in constant fear that her exposed New York State Identification Card will be used for identity theft, or that her data will be used for nefarious purposes.

80.     Further, plaintiff is aware that bad actors are proliferating the PII obtained from Tea through the Data Breach on social media, exposing and trolling Tea users as a group as well as individually. Plaintiff lives in fear of embarrassment and retaliation by these bad actors, and worries that, if exposed, she will suffer reputational damage as well as loss of income. With Tea, anonymity was her only protection. Defendants stole that from her.

**North Carolina Plaintiffs**

**Jane Doe 12**

81.     Plaintiff Jane Doe 12 is a natural person and citizen of North Carolina. To protect her safety and privacy, Plaintiff proceeds under a pseudonym. Given the nature of this breach and the sensitive information exposed, Plaintiff has a substantial privacy interest that outweighs the public's interest in knowing her identity.

82.     Plaintiff began using the Tea app prior to the Data Breach. Plaintiff was required to provide, and did provide, her sensitive PII to Defendant Tea in order to use the Tea app. Plaintiff was also required to upload her government ID. As a result of the Data Breach, Plaintiffs' PII, including a photo of her driver's license, was exposed to unauthorized third parties.

83.     Plaintiff downloaded and joined Tea because she wanted to warn other women about a man who sexually assaulted her. Plaintiff specifically chose Tea because it promised anonymous reporting—she could fulfill her moral obligation to warn others without exposing herself to potential retaliation. In order to use Tea, Plaintiff was required to submit a photo of her driver's license and additional PII through the Tea app, which she did. That photograph and information has now been released as a result of this Data Breach, despite the fact that Plaintiff had not yet had the opportunity to post any reports. Plaintiff is afraid for her safety due to the significant threats of violence that have been circulating on social media directed towards the users of the Tea app.

AMENDED CLASS ACTION COMPLAINT

84.     As a direct result of Tea's failures and the subsequent distribution of her data through social media, Plaintiff has suffered and continues to suffer significant harm. She has spent and will spend considerable time and money on protective measures, including freezing her credit and identity theft protection. She lives in constant fear that her exposed driver's license will be used for identity theft, that her data will be used for nefarious purposes, or worst of all, that the man she reported will find out she is a Tea app user and seek retaliation.

85.     Further, plaintiff is aware that bad actors are proliferating the PII obtained from Tea through the Data Breach on social media, exposing and trolling Tea users as a group as well as individually. Plaintiff lives in fear of embarrassment and retaliation by these bad actors, and worries that, if exposed, she will suffer reputational damage as well as loss of income. With Tea, anonymity was her only protection. Defendants stole that from her.

**Jane Doe 13**

86.     Plaintiff Jane Doe 13 is a natural person and citizen of North Carolina. To protect her safety and privacy, Plaintiff proceeds under a pseudonym. Given the nature of this breach and the sensitive information exposed, Plaintiff has a substantial privacy interest that outweighs the public's interest in knowing her identity.

87.     Plaintiff began using the Tea app prior to the Data Breach. Plaintiff was required to provide, and did provide, her sensitive PII to Defendant Tea in order to use the Tea app. Plaintiff was also required to upload her government ID. As a result of the Data Breach, Plaintiffs' PII, including a photo of her driver's license, was exposed to unauthorized third parties.

88.     Plaintiff downloaded and joined Tea as a safety precaution after finding out that the man she was seeing was married. Plaintiff specifically chose Tea because it promised anonymous reporting. In order to use Tea, Plaintiff was required to submit a photo of her driver's license and additional PII through the Tea app, which she did. That photograph and information has now been released as a result of this Data Breach.

89.     As a direct result of Tea's failures and the subsequent distribution of her data through social media, Plaintiff has suffered and continues to suffer significant harm. She has spent and will spend considerable time and money on protective measures, including identity theft protection. She lives in

- 17 -

constant fear that her exposed driver's license will be used for identity theft, or that her data will be used for nefarious purposes.

90.     Further, plaintiff is aware that bad actors are proliferating the PII obtained from Tea through the Data Breach on social media, exposing and trolling Tea users as a group as well as individually. Plaintiff lives in fear of embarrassment and retaliation by these bad actors, and worries that, if exposed, she will suffer reputational damage as well as loss of income. With Tea, anonymity was her only protection. Defendants stole that from her.

**Jane Doe 14**

91.     Plaintiff Jane Doe 14 is a natural person and citizen of North Carolina. To protect her safety and privacy, Plaintiff proceeds under a pseudonym. Given the nature of this breach and the sensitive information exposed, Plaintiff has a substantial privacy interest that outweighs the public's interest in knowing her identity.

92.     Plaintiff began using the Tea app prior to the Data Breach. Plaintiff was required to provide, and did provide, her sensitive PII to Defendant Tea in order to use the Tea app. Plaintiff was also required to upload her government ID. As a result of the Data Breach, Plaintiffs' PII, including a photo of her North Carolina Department of Motor Vehicles Identification Card, was exposed to unauthorized third parties.

93.     Plaintiff downloaded and joined Tea because she wanted to confirm whether the father of her child was unfaithful. Plaintiff specifically chose Tea because it promised anonymity. In order to use Tea, Plaintiff was required to submit a photo of her North Carolina Department of Motor Vehicles Identification Card and additional PII through the Tea app, which she did. That photograph and information has now been released as a result of this Data Breach. Plaintiff is afraid the man in question will soon find out that Plaintiff sought information about him on the Tea app. Accordingly, Plaintiff is in fear for her safety as a result of this Data Breach.

94.     As a direct result of Tea's failures and the subsequent distribution of her data through social media, Plaintiff has suffered and continues to suffer significant harm. She has spent and will spend considerable time and money on protective measures, including identity theft protection. She lives in constant fear that her exposed North Carolina Department of Motor Vehicles Identification Card will be used for identity theft, or that her data will be used for nefarious purposes.

AMENDED CLASS ACTION COMPLAINT

95.     Further, plaintiff is aware that bad actors are proliferating the PII obtained from Tea through the Data Breach on social media, exposing and trolling Tea users as a group as well as individually. Plaintiff lives in fear of embarrassment and retaliation by these bad actors, and worries that, if exposed, she will suffer reputational damage as well as loss of income. With Tea, anonymity was her only protection. Defendants stole that from her.

**Texas Plaintiffs**

**Jane Doe 15**

96.     Plaintiff Jane Doe 15 is a natural person and citizen of Texas. To protect her safety and privacy, Plaintiff proceeds under a pseudonym. Given the nature of this breach and the sensitive information exposed, Plaintiff has a substantial privacy interest that outweighs the public's interest in knowing her identity.

97.     Plaintiff began using the Tea app prior to February 2024. Plaintiff was required to provide, and did provide, her sensitive PII to Defendant Tea in order to use the Tea app. Plaintiff was also required to upload her government ID. As a result of the Data Breach, Plaintiffs' PII, including a photo of her driver's license, was exposed to unauthorized third parties.

98.     Plaintiff downloaded and joined Tea because she wanted to anonymously report a man who had cheated on her and took/proliferated pornographic videos of her without her consent. She had previously posted about him on another platform designed for women to warn each other about men, and he confronted her when he found out. Plaintiff specifically chose Tea because it promised anonymous reporting—she could fulfill her moral obligation to warn others without exposing herself to potential retaliation. In order to use Tea, Plaintiff was required to submit a photo of her driver's license and additional PII through the Tea app, which she did. That photograph and information has now been released as a result of this Data Breach. Plaintiff is afraid the man in question will soon find out that Plaintiff responded to posts about him on the Tea app. Accordingly, Plaintiff is in fear for her safety as a result of this Data Breach.

99.     As a direct result of Tea's failures and the subsequent distribution of her data through social media, Plaintiff has suffered and continues to suffer significant harm. She has spent and will spend considerable time and money on protective measures, including identity theft protection. She lives in

constant fear that her exposed driver's license will be used for identity theft, that her data will be used for nefarious purposes, or worst of all, that the man she commented on will find out she did so and seek retaliation.

100.    Further, plaintiff is aware that bad actors are proliferating the PII obtained from Tea through the Data Breach on social media, exposing and trolling Tea users as a group as well as individually. Plaintiff lives in fear of embarrassment and retaliation by these bad actors, and worries that, if exposed, she will suffer reputational damage as well as loss of income. With Tea, anonymity was her only protection. Defendants stole that from her.

**Jane Doe 16**

101.    Plaintiff Jane Doe 16 is a natural person and citizen of Texas. To protect her safety and privacy, Plaintiff proceeds under a pseudonym. Given the nature of this breach and the sensitive information exposed, Plaintiff has a substantial privacy interest that outweighs the public's interest in knowing her identity.

102.    Plaintiff began using the Tea app prior to the Data Breach. Plaintiff was required to provide, and did provide, her sensitive PII to Defendant Tea in order to use the Tea app. Plaintiff was also required to upload her government ID. As a result of the Data Breach, Plaintiffs' PII, including a copy of her driver's license, was exposed to unauthorized third parties.

103.    Plaintiff downloaded and joined Tea to assist her cousin in determining that her husband was cheating on her. Plaintiff specifically chose Tea because it promised anonymity. In order to use Tea, Plaintiff was required to submit a photo of her driver's license and additional PII through the Tea app, which she did. That photograph and information has now been released as a result of this Data Breach. Plaintiff has already been directly harassed by one person whom she does now know who sent her a photo of her own ID after finding her leaked information. Plaintiff is also afraid for her safety due to the significant threats of violence that have been circulating on social media directed towards the users of the Tea app.

104.    As a direct result of Tea's failures and the subsequent distribution of her data through social media, Plaintiff has suffered and continues to suffer significant harm. She has spent and will spend considerable time and money on protective measures, including identity theft protection. She lives in

constant fear that her exposed driver's license will be used for identity theft, or that her data will be used for nefarious purposes.

105. Further, plaintiff is aware that bad actors are proliferating the PII obtained from Tea through the Data Breach on social media, exposing and trolling Tea users as a group as well as individually. Plaintiff lives in fear of embarrassment and retaliation by these bad actors, and worries that, if exposed, she will suffer reputational damage as well as loss of income. With Tea, anonymity was her only protection. Defendants stole that from her.

**Jane Doe 17**

106. Plaintiff Jane Doe 17 is a natural person and citizen of Texas. To protect her safety and privacy, Plaintiff proceeds under a pseudonym. Given the nature of this breach and the sensitive information exposed, Plaintiff has a substantial privacy interest that outweighs the public's interest in knowing her identity.

107. Plaintiff began using the Tea app prior to February 2024. Plaintiff was required to provide, and did provide, her sensitive PII to Defendant Tea in order to use the Tea app. Plaintiff was also required to upload her government ID. As a result of the Data Breach, Plaintiffs' PII, including a photo of her driver's license, was exposed to unauthorized third parties.

108. Plaintiff downloaded and joined Tea because she wanted to protect her daughters and stay up to date on safety issues within her community. Plaintiff specifically chose Tea because it promised anonymity. In order to use Tea, Plaintiff was required to submit a photo of her driver's license and additional PII through the Tea app, which she did. That photograph and information has now been released as a result of this Data Breach. Plaintiff saw a social media post exposing pictures of the hacked government ID's and selfies, including a photo of her own driver's license, with her current address. Plaintiff is afraid for her safety and the safety of her family due to the harassing posts and threats of violence that have been circulating on social media directed towards the users of the Tea app.

109. As a direct result of Tea's failures and the subsequent distribution of her data through social media, Plaintiff has suffered and continues to suffer significant harm. She has spent and will spend considerable time and money on protective measures, including identity theft protection. She lives in

AMENDED CLASS ACTION COMPLAINT

1    constant fear that her exposed driver's license will be used for identity theft, or that her data will be used

2    for nefarious purposes.

3        110.    Further, plaintiff is aware that bad actors are proliferating the PII obtained from Tea

4    through the Data Breach on social media, exposing and trolling Tea users as a group as well as

5    individually. Plaintiff lives in fear of embarrassment and retaliation by these bad actors, and worries that,

6    if exposed, she will suffer reputational damage as well as loss of income. With Tea, anonymity was her

7    only protection. Defendants stole that from her.

8    **Jane Doe 18**

9        111.    Plaintiff Jane Doe 18 is a natural person and citizen of Texas. She is a veteran. To protect

10   her safety and privacy, Plaintiff proceeds under a pseudonym. Given the nature of this breach and the

11   sensitive information exposed, Plaintiff has a substantial privacy interest that outweighs the public's

12   interest in knowing her identity.

13       112.    Plaintiff began using the Tea app prior to February 2024. Plaintiff was required to provide,

14   and did provide, her sensitive PII to Defendant Tea in order to use the Tea app. Plaintiff was also required

15   to upload her government ID. As a result of the Data Breach, Plaintiffs' PII, including her driver's license

16   information, was exposed to unauthorized third parties.

17       113.    Plaintiff downloaded and joined Tea after she was sexually assaulted by a man in her

18   community. Plaintiff specifically chose Tea because it promised anonymous reporting—she could fulfill

19   her moral obligation to warn others without exposing herself to potential retaliation. In order to use Tea,

20   Plaintiff was required to submit a photo of her driver's license and additional PII through the Tea app,

21   which she did. That photograph and information has now been released as a result of this Data Breach.

22   Although, to the best of her recollection, Plaintiff did not ultimately end up making a post about the man

23   who sexually assaulted her, her identity has been disclosed. Plaintiff is afraid for her safety due to the

24   harassing comments and threats of violence that have been circulating on social media directed towards

25   the users of the Tea app.

26       114.    As a direct result of Tea's failures and the subsequent distribution of her data through social

27   media, Plaintiff has suffered and continues to suffer significant harm. She has observed harassing social

28   mediate posts targeting women who served or were affiliated with the military. She has spent and will

spend considerable time and money on protective measures, including identity theft protection. She lives in constant fear that her exposed driver's license will be used for identity theft, or that her data will be used for nefarious purposes.

115.    Further, plaintiff is aware that bad actors are proliferating the PII obtained from Tea through the Data Breach on social media, exposing and trolling Tea users as a group as well as individually. Plaintiff lives in fear of embarrassment and retaliation by these bad actors, and worries that, if exposed, she will suffer reputational damage as well as loss of income. With Tea, anonymity was her only protection. Defendants stole that from her.

**Jane Doe 19**

116.    Plaintiff Jane Doe 19 is a natural person and citizen of Texas. To protect her safety and privacy, Plaintiff proceeds under a pseudonym. Given the nature of this breach and the sensitive information exposed, Plaintiff has a substantial privacy interest that outweighs the public's interest in knowing her identity.

117.    Plaintiff began using the Tea app prior to the Data Breach. Plaintiff was required to provide, and did provide, her sensitive PII to Defendant Tea in order to use the Tea app. Plaintiff was also required to upload her government ID. As a result of the Data Breach, Plaintiffs' PII, including a photo of her driver's license, was exposed to unauthorized third parties.

118.    Plaintiff downloaded and joined Tea because she wanted to put herself at ease regarding the men she met during online dating. Plaintiff specifically chose Tea because it promised anonymity— she could seek out information about men without fear of retaliation. In order to use Tea, Plaintiff was required to submit a photo of her driver's license and additional PII through the Tea app, which she did. That photograph and information has now been released as a result of this Data Breach. Plaintiff is afraid for her safety due to the significant threats of violence that have been circulating on social media directed towards the users of the Tea app.

119.    As a direct result of Tea's failures and the subsequent distribution of her data through social media, Plaintiff has suffered and continues to suffer significant harm. She has spent and will spend considerable time and money on protective measures, including identity theft protection. She lives in

constant fear that her exposed driver's license will be used for identity theft, or that her data will be used for nefarious purposes.

120.    Further, plaintiff is aware that bad actors are proliferating the PII obtained from Tea through the Data Breach on social media, exposing and trolling Tea users as a group as well as individually. Plaintiff lives in fear of embarrassment and retaliation by these bad actors, and worries that, if exposed, she will suffer reputational damage as well as loss of income. With Tea, anonymity was her only protection. Defendants stole that from her.

**Defendants**

121.    **Defendant Tea Dating Advice, Inc.** is a Delaware corporation doing business as "Tea" or "Tea App," with its principal place of business at 201 Spear St., Suite 1100, San Francisco, California 94105. Tea operates a mobile application and online platform marketed as a "dating advice" and safety tool exclusively for women.

122.    Tea launched with a deceptively simple premise: create a space where women could share their dating experiences and warn each other about problematic men. The app rocketed to the #1 position on the App Store, capitalizing on women's legitimate safety concerns in the modern dating landscape. *See* Lucas Ropek, *Dating App That Lets Women 'Rate' Men Hits Number 1 on the App Store, Immediately Suffers Data Breach*, Gizmodo (July 25, 2025), https://gizmodo.com/dating-app-that-lets-women-rate-men-hits-number-1-on-the-app-store-immediately-suffers-data-breach-2000634647.

123.    Central to Tea's business model was its promise of creating a "safe space" for women. Marketing materials emphasized anonymity, privacy, security, and sisterhood. *See, e.g.*, *Home Page*, Tea Dating Advice, Inc., https://www.teaforwomen.com (last visited July 28, 2025). Tea positioned itself as the antidote to traditional dating apps that had failed to protect women's safety. This positioning was not mere puffery—it was the core value proposition that convinced women to trust Tea with extraordinarily sensitive information.

124.    Despite holding itself out as a guardian of women's safety, Tea is a venture-backed startup that prioritized rapid growth over basic security. Led by CEO Sean Cook, the company raised funding based on explosive user growth numbers while apparently devoting minimal resources to data security. Angela Yang, *Women Are Anonymously Spilling Tea About Men in Their Cities on Viral App*, NBC News

(July 25, 2025) https://www.nbcnews.com/tech/tech-news/women-are-anonymously-spilling-tea-men-cities-viral-app-rcna220681 (reporting 4 million users with another 900,000 on the waitlist). When the breach was discovered, Cook went into hiding—refusing to respond to media inquiries or provide any public explanation for his company's catastrophic failures.

125.    **Defendant X Corp.** is a Nevada corporation with its principal place of business in San Francisco, California. X Corp. owns and operates the social media platform formerly known as Twitter, which has become a primary vehicle for the dissemination of Tea users' stolen personal information, as well as harassment and threats of violence against Tea users. Despite knowledge of the breach and the sensitive nature of the exposed data, X Corp. has failed to take adequate measures to prevent the continued spread of stolen driver's licenses and identity documents on its platform.

126.    At all relevant times, Defendants owned, operated, and controlled their respective platforms. Each Defendant made decisions that directly contributed to the exposure and ongoing harm from this breach. The security failures of Tea, combined with the amplification and distribution capabilities of X Corp., created a perfect storm that transformed a data breach into a permanent privacy catastrophe.

## **JURISDICTION AND VENUE**

127.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which: (a) there are 100 or more members in the proposed classes; (b) members of the proposed classes have a different citizenship from Defendants; and (c) the claims of the proposed class members exceed the sum or value of $5,000,000, exclusive of interest and costs.

128.    This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs bring claims under the Driver's Privacy Protection Act, 18 U.S.C. § 2721 et seq., which is a federal statute providing a private right of action.

129.    This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

130.    This Court has personal jurisdiction over all Defendants because each Defendant conducts substantial business in this District, has sufficient minimum contacts with California, and otherwise purposefully avails itself of the markets in California through its business activities. Tea and X Corp. market their services to and have thousands or millions of users in California. Each Defendant's conduct had direct and foreseeable effects in this District.

131.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Defendants conduct substantial business in this District, market their services to residents of this District, and the data breach affected numerous residents of this District. Additionally, Defendants' negligent data security practices and failure to prevent dissemination of stolen data had direct and foreseeable effects in this District.

132.    Venue is also proper in this District under 28 U.S.C. § 1391(b)(1) because Defendants are subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

### A.    Tea's Meteoric Rise: From Safety App to Privacy Nightmare

133.    Tea was launched in 2023 as a platform where women could privately share the unvarnished truth about their dating experiences without fear of retaliation, harassment, or judgment.

134.    The concept was revolutionary in its simplicity: a members-only community where verified women could rate and review men they had dated, warning others about red flags, cheating behavior, dangerous behavior, or simply disappointing dinner conversation.

135.    The timing was perfect. In an era of #MeToo awareness and growing consciousness about dating violence, Tea offered what traditional dating apps had failed to provide: a backchannel for women's safety. While apps like Tinder and Bumble focused on making matches, Tea focused on keeping women alive and unharmed. It was whisper network technology—the digital evolution of women pulling each other aside at parties to warn, "Stay away from that guy."

136.    Tea's marketing brilliantly tapped into this zeitgeist. Social media influencers shared stories of how Tea helped them avoid dangerous situations. The message resonated powerfully: in a world where one in three women experience physical or sexual violence, Tea was a necessary tool for survival.

137.    The app's exclusive nature—only verified women could join—added to its appeal. This wasn't another platform where men could infiltrate and harass. This was a protected space, a digital sanctuary. Tea marketed this exclusivity as both a feature and a security measure, claiming to have an "extremely tedious" approval process to "protect the women in Tea" and priding itself "on being very thorough." Yi-Jin Yu and Katie Kindelan, *Tea Dating Advice App Confirms Hack, Says 72K Images, Including Selfies, Accessed*, ABC NEWS (July 25, 2025), https://abcnews.go.com/GMA/Living/new-dating-advice-app-tea-rockets-1-app/story?id=124067965.

138.    Tea's marketing was focused on the exclusive, safe, and anonymous nature of the Tea App. For instance, Tea marketed itself as "the safest place to spill the tea":



AMENDED CLASS ACTION COMPLAINT

139.    It promised its app would "protect women":

  

 

140.    It promised "dating safety tools" on a "secure, anonymous platform . . . built on trust":

**THE MOVEMENT**

Navigating the modern dating scene can be daunting - and scary - *hello dateline*! But with Tea, you're never alone 👯

Join a community of over 4,647,000 women dedicated to empowering each other and get access to a suite of dating safety tools made just for the FBI girlies 🕵️

Share experiences and seek advice within a secure, anonymous platform. Tea is built on trust; screenshots are blocked and all members are verified as women 🫡

Tea is more than an app; it's a sisterhood. Together, we're redefining modern dating. Plus, we give back—10% of profits are donated to the National Domestic Violence Hotline 🙏

Join Tea today and get ready to conquer the dating scene, one cup at a time - your new besties are waiting! 🧋

AMENDED CLASS ACTION COMPLAINT

141.    Tea's marketing also highlighted the various safety features that Tea users could employ:



142.    Its Privacy Policy reassured users, too. Tea promised that: "All the data we collect at Tea Dating Advice is necessary for us to deliver the services you use. The amount we collect has been minimized wherever possible to respect your privacy."[2]

143.    The numbers tell the story of Tea's explosive growth. Tea claimed the #1 spot on the Apple App Store. By July 2025, the company boasted 4 million users with another 900,000 on the waitlist. The media crowned Tea the next unicorn startup, the app that would revolutionize dating by putting women's safety first.

144.    While Tea was available for free download, it allotted users just a few free searches, and charged for a number of in-app purchases, including more searches, or the ability to use any of its highly touted safety features like its background check, sex offender map, criminal record search, and reverse image search. Its In-App Purchases include:

- Tea Pro – Monthly: $14.99
- Tea Pro – Monthly: $19.99
- Tea Premium: $4.99
- Tea Pro – Monthly: $9.99

---

[2] *See*, *Privacy Policy*, TEA, version updated December 28, 2022, https://web.archive.org/web/20250725020234/https://www.teaforwomen.com/privacy

AMENDED CLASS ACTION COMPLAINT

- Tea Premium: $4.99

- Reverse Image Search Bundle (3): $7.99

- Criminal Record Check Bundle (2): $7.99

- Private Background Check: $19.99

- Tea Premium: $29.99

- Background Check Bundle (3): $7.99[3]

145.    But behind the feminist messaging and slick marketing lay a disturbing reality: Tea was just another venture-backed startup chasing growth at any cost. The company's actual commitment to women's safety extended exactly as far as its marketing budget. When it came to the unglamorous work of securing user data, Tea took a different approach: do the absolute minimum and hope nobody notices. Until someone did.

**B.    The Identity Verification Trap: How Tea Collected a Goldmine of Sensitive Data**

146.    To join Tea's exclusive community, women had to pass through a stringent identity verification process. This wasn't a simple email confirmation or phone number verification. Tea demanded government-issued photo identification—driver's licenses, passports, state IDs—along with other sensitive and private information. No privacy protection. Just hand over the keys to your identity and trust that Tea would keep them safe.

147.    For women like Plaintiffs, this requirement created an agonizing dilemma. The very reason they needed Tea—to anonymously report dangerous men—made them reluctant to provide such sensitive information. But Tea's marketing was persuasive. It promised the data would be stored securely. It promised it would be deleted after verification. It promised that sacrificing privacy during onboarding would guarantee anonymity when it mattered.

148.    Tea specifically promised to protect the information that it received during its thorough verification process. According to Tea's Privacy Policy in effect from December 2022 to the time of the

---

[3] *Tea Dating Advice App*, Apple App Store, https://apps.apple.com/us/app/tea-dating-advice/id6444453051 (last accessed Sept. 23, 2025)

breach, the information Tea requires women to provide to verify their identities would only be held temporarily. Tea's Privacy Policy explicitly promised:

> During the registration process, users are required to submit a selfie photo for verification purposes. This photo is securely processed and stored only temporarily and will be deleted immediately following the completion of the verification process.[4]

149.    Tea further promised its users that it would only keep their information if it had a legitimate business need, stating "[w]hen we have no ongoing legitimate business need to process personal information, we will either delete or anonymize it or, if this is not possible (for example, because personal information has been stored in backup archives), then we will securely store personal information and isolate it from any further processing until deletion is possible." *Id.*

150.    Tea emphasized in its Privacy Policy how important its users' data security was, telling users that "[t]he security of your Personal Information is important to us," and that Tea "takes reasonable security measures to protect your Personal Information to prevent loss, misuse, unauthorized access, disclosure, alteration, and destruction." *Id.*

151.    By making these promises, Tea convinced millions of users to trust Tea with their sensitive data, including photos of their government ID's.

152.    Tea knew exactly what it was collecting. A driver's license contains a treasure trove of personal information: full legal name, date of birth, home address, physical description, photo, signature, and a unique license number tied to government databases.

153.    Paired with other sensitive information, this created a perfect package for identity thieves: everything needed to open credit accounts, bypass security systems, or create convincing fake identities. *See Patel v. Facebook, Inc.*, 932 F.3d 1264, 1273 (9th Cir. 2019) (recognizing unique risks of biometric data).

154.    With these images and other sensitive information, criminals could potentially:

   a.    Create deepfake videos for fraud or harassment

   b.    Bypass facial recognition security systems

---

[4] *See*, *Privacy Policy*, TEA, version updated December 28, 2022, https://web.archive.org/web/20250725020234/https://www.teaforwomen.com/privacy

AMENDED CLASS ACTION COMPLAINT

     c.   Impersonate victims in video calls with banks or government agencies

     d.   Build comprehensive profiles for stalking or doxxing

     e.   Sell "verified" identities on dark web marketplaces

*See* Rana Ayyub, *I Was the Victim of a Deepfake Porn Plot Intended to Silence Me*, Huffington Post (Nov. 21, 2018), https://www.huffingtonpost.co.uk/entry/deepfake-porn_uk_5bf2c126e4b0f32bd58ba316.

155.    Tea understood these risks. Any company collecting such sensitive data in 2023 through 2025 knew the stakes. Data breaches had become so common they barely made headlines unless they were spectacular in scope or incompetence. Yet Tea proceeded to collect this information from numerous women, storing it all in one convenient location, protected by exactly nothing.

**C.**   <u>**Firebase Fiasco: How Tea Left the Vault Door Wide Open**</u>

156.    The technical details of Tea's security failure would be comedy if the consequences weren't so tragic. Tea stored its collection of user verification data—72,000 images—in a Google Firebase cloud storage bucket. Cox, *supra*; Whittaker, *supra*. For those unfamiliar with cloud storage, imagine a digital filing cabinet that can be configured to be locked tight or left wide open for anyone to rifle through. Tea chose the latter.

157.    Firebase, Google's cloud platform, is actually a robust and secure service—when configured properly. Storage buckets, in particular, require developers to configure access restrictions. Google Cloud Firebase, *Understand Firebase Security Rules for Cloud Storage*, *supra*.

158.    Tea never cared. It left its Firebase bucket configured for completely public access. No authentication required. No access logs to track who was downloading data. No encryption to protect the files. Just a URL that anyone could access, like leaving diamonds in a cardboard box on the sidewalk.

159.    Security professionals have a term for this kind of configuration: "misconfigured S3 bucket" (named after Amazon's storage service, though the principle applies to all cloud storage). It's such a common vulnerability that security researchers regularly scan the internet looking for exposed buckets. There are automated tools that can find them. There are countless articles warning about them. There are horror stories of companies destroyed by them. *See Best Practices for Cloud Storage*, Google Cloud Documentation, https://cloud.google.com/storage/docs/best-practices (last visited July 28, 2025).

Yet Tea fell into the same trap that has caught countless others who prioritized speed and profits over security.

160.    On the evening of July 25, 2025, users on 4chan's technology board launched what they called a "raid" on Tea. Cox, *supra.* 4chan is an anonymous imageboard that has become synonymous with coordinated harassment campaigns, particularly against women. Dewey, *supra*. Its users have weaponized doxxing—publishing private information to enable harassment—into an art form. And Tea had just handed them the perfect ammunition.

161.    The original post that started it all was a call to arms: Anonymous users discovered Tea's exposed Firebase bucket and immediately recognized the goldmine they'd found. "DRIVERS LICENSES AND FACE PICS! GET THE FUCK IN HERE BEFORE THEY SHUT IT DOWN!" screamed the post that would soon destroy thousands of women's privacy and security. Cox, *supra*; Collier and Yang, *supra*.

162.    What followed was a feeding frenzy of the worst kind. Anonymous users didn't just browse the exposed data—they systematically downloaded everything. They created automated scripts to scrape every image. They built torrents to ensure the data would live forever on peer-to-peer networks. They uploaded copies to file-sharing sites. Within hours, 72,000 images containing the sensitive personal information of Tea's users had been scattered across the internet like dandelion seeds in the wind— impossible to retrieve, impossible to delete.

163.    The 4chan users understood exactly what they had found. These weren't just random photos—they were identity verification goldmines. Some anonymous posters bragged about the "quality" of the data. Others celebrated finding users from their local area.

164.    But the violation went deeper than identity theft. 4chan users created searchable databases containing Tea users' leaked data, and extracted location data from EXIF metadata to create maps of Tea users' locations. *See* Williams, Austin, *Tea app fallout worsens as leaked selfies used in rating site, online map*, LiveNow Fox, (July 28, 2025), https://www.livenowfox.com/news/tea-app-breach-fallout?. They transformed a safety app into a stalker's paradise.

165.    Tea's security failures extended beyond the image storage. Days later, the breach was discovered to be far more extensive than initially reported—exposing not just 72,000 images but also over 1.1 million private messages between users, containing intimate discussions about reproductive health,

AMENDED CLASS ACTION COMPLAINT

relationships, and personal safety. Tea's failure to secure these messages demonstrates the systemic nature of its negligence.

166.    Particularly troubling is the fact that reports indicate that using the leaked direct messages, "it's possible to identify users based on social media profiles, phone numbers, or other personal details revealed in the messages." Abrams, Lawrence, *Tea app leak worsens with second database exposing user chats*, BleepingComputer, (July 28, 2025) https://www.bleepingcomputer.com/news/security/tea-app-leak-worsens-with-second-database-exposing-user-chats/?.

167.    The breach might have been contained to 4chan's dark corners, but Defendant X Corp.'s platform ensured maximum exposure and harm. Within hours of the initial 4chan discovery, X users began posting screenshots of the stolen data, links to download sites, and cruel commentary mocking the exposed women.

168.    Posts on X weaponized the data. Users created threads identifying specific women, posting their driver's licenses, or linking to maps showing Tea users' locations. Williams, Austin, *Tea app fallout worsens as leaked selfies used in rating site, online map*, LiveNow Fox, (July 28, 2025), https://www.livenowfox.com/news/tea-app-breach-fallout?. The platform's algorithm amplified these posts, spreading them to thousands of users who might never have visited 4chan.

169.    Despite the obvious violation of its terms of service and potential criminal nature of sharing stolen government IDs, X Corp. failed to take swift action. Posts containing links to the stolen data remained active for hours or days. X Corp.'s inadequate response ensured that the stolen data reached a far wider audience than 4chan alone could have achieved.

170.    Most damning, X Corp. failed to implement an adequate approach to preventing the spread of Tea breach data. While the platform has sophisticated systems for detecting copyrighted content or terrorist propaganda, it failed and continues to fail to prevent the mass distribution of stolen driver's licenses and identity documents. This failure transformed X from a social media platform into an accessory to identity theft on a massive scale.

**D. Woefully Inadequate Cybersecurity: How Tea Failed to Detect the Breach and Obfuscated When it Found out About the Breach from a Reporter**

171.    Automated systems should have flagged the suspicious activity—gigabytes of data being downloaded by unauthorized users. But Tea's security monitoring was apparently as robust as their data protection: nonexistent.

172.    It wasn't until 404 Media, a cybersecurity news outlet, independently verified the breach and contacted Tea for comment that the company even acknowledged something had gone wrong. Cox, *supra*. Tea learned about the massive breach of its users' most sensitive data from a reporter, not from their own security systems.

173.    Tea's initial response was a masterclass in corporate cowardice. CEO Sean Cook, who had been eager to talk to media when Tea was riding high at #1 on the App Store, suddenly became unreachable. He didn't respond to emails. He didn't answer LinkedIn messages. He didn't pick up the phone. As women's identities spread across the dark corners of the internet, the man responsible for protecting them was nowhere to be found.

174.    When Tea finally issued a statement on July 25, it came not through direct notification to affected users—as required by law—but through an Instagram post on @theteapartygirls. Tea's statement was a marvel of corporate minimization and misdirection. "We discovered unauthorized access to an archived data system. If you signed up for Tea after February 2024, all your data is secure." Tea Dating Advice,       Inc. (@theteapartygirls),       Instagram       (July       25,       2025), https://www.instagram.com/p/DMjRl4CPE0z/?igsh=cnVvem5ndWl6a2Fk.

175.    To the extent this glib and inadequate "notice" of the Data Breach was meant to assuage those who signed up after February 2024, it appears to be another lie. Tea cannot be trusted in its public statements about the scope of the Breach.

176.    Days later, researchers revealed that over 1.1 million private messages had also been compromised. Tea's response was to quietly disable its direct messaging feature and post another Instagram update. Tea Dating Advice, Inc. (@theteapartygirls), Instagram (July 28, 2025), https://www.instagram.com/p/DMrGSlrJA-e/?hl=en&img_index=1.

177.    Tea made no acknowledgment of what data was exposed, any explanation of how it happened, any apology to the affected users, any practical guidance for protecting themselves, or any

recognition of the unique dangers facing women whose identities had been exposed after reporting dangerous men.

178.    Tea's claim that the exposed data was in a legacy data storage system was particularly galling. Tea later claimed it retained this data "in compliance with law enforcement requirements related to cyberbullying prevention," but this explanation raises more questions than it answers. What law requires retaining driver's licenses and selfies indefinitely? Why store them in an unsecured bucket? Why not inform users their data would be retained?

179.    Meanwhile, affected users like Plaintiffs were left to discover the breach through news reports, left to their own devices to figure out the true scale of the data breach, the potential danger to themselves, and the means to protect themselves.

180.    The contrast between Tea's marketing promises and their breach response could not be starker. The app that promised to "have women's backs" had stabbed them in the back. The platform that offered "safety" had created danger. The company that valued "sisterhood" had abandoned its sisters in their moment of greatest need.

**E.    The Notice: Tea's Belated Notice and Woefully Inadequate Offer of Remediation**

181.    It was not until August 28, 2025, that Tea began to provide notice of the breach to a subset of approximately 4,000 users. See, *Notice of a Data Breach*, Office of the Maine Attorney General, Data Breach Notifications, https://www.maine.gov/cgi-bin/agviewerad/ret?loc=2979 (last visited Sept. 23, 2025) ("Notice of Data Breach").

182.    However, even this notice was woefully insufficient. In describing the data breach, the notice stated:

> **What Happened?** Tea learned on July 25, 2025, of unauthorized access to a file storage location that contained records used to verify new app users. This unauthorized access occurred on or around July 24, 2025. We launched an investigation and took measures to contain the incident. We have also notified law enforcement. There are indications of unauthorized access to most or possibly all the records in the file storage location. While we are continuing to investigate the matter, we reviewed all of the records in the file storage location and one or more of them contained your information.
>
> **What Information Was Involved?** The image you provided for identity verification included some combination of your name, date of birth, driver's license number, passport number, and/or other government identification number.

183.    In its Notice of Data Breach, Tea offered a meager two-year membership for an identity monitoring service. This offer was limited to the subset of users to whom Tea provided notice.

184.    Further, as is evidenced by the language Tea uses to describe the information that was involved, Tea sent this Notice only to individuals whose driver's license, passport number, or other government identification number were involved. Tea did not send this notice to the women who had their private messages disclosed. Arntz, Pieter, *Tea Dating Advice app has users' private messages disclosed*, MalwarebytesLabs, (July 29, 2025) https://www.malwarebytes.com/blog/news/2025/07/tea-dating-advice-app-has-users-private-messages-disclosed.

185.    The implication of Tea's failure to notify these individuals is that only government-issued IDs contain private information, but that is not true. As Tea is aware from the reverse image search function in its own app, photos can be used to identify individuals.

186.    Images also contain metadata, which can reveal information such as precise location.

187.    Moreover, according to reports from the researcher who flagged the exposure of the direct messages, "[w]ith the content of these messages at hand, it was trivial to find social media profiles, telephone numbers, and the real-world identities of most users." *Id*.

F.    **The Unique and Devastating Harm: When Safety Apps Become Weapons**

188.    Data breaches have become so common that we risk becoming numb to their impact. Another million credit cards stolen. Another database of passwords exposed. But the Tea breach stands apart for the particularly cruel nature of its harm. This wasn't just data—it was trust. This wasn't just privacy—it was safety.

189.    Consider the typical Tea user: a woman who had experienced something troubling, dangerous, or traumatic in the dating world and wanted to protect herself. Or someone who felt a moral obligation to warn others but needed anonymity to do so safely. Someone like Plaintiff Jane Doe, who knew that in her small town, publicly accusing a man of sexual assault would make her a target, or Jane Doe 15, who wanted to warn other women about a man who had taken and proliferated sexually explicit videos of her without her consent. These women came to Tea because traditional systems had failed them.

AMENDED CLASS ACTION COMPLAINT

The police couldn't or wouldn't help. Social media was too public. Word-of-mouth was too limited. Tea promised a solution: anonymous widespread warnings backed by verified identities.

190.    Now consider what the breach means for these women:

a.    **Identity Theft on Steroids**: The combination of driver's licenses and other private, sensitive information provides everything needed for sophisticated identity fraud. Unlike credit card numbers that can be cancelled or passwords that can be changed, driver's license numbers are static identifiers, and the biometric data in those government IDs and selfies is forever. *See Rosenbach v. Six Flags Entm't Corp.*, 129 N.E.3d 1197, 1206 (Ill. 2019) ("Biometrics [] are biologically unique" to the individual; they cannot be "changed if compromised or misused").

b.    **Real-World Stalking Risks**: For women who joined the Tea app, the breach created immediate physical safety concerns. Their full names and home addresses are now connected to their Tea membership and possibly their posts. The angry men who clamored for a hack on 4chan, thirsting for revenge, and making violent threats, and the men that the women warned about—men who had already shown themselves capable of violence—now have a roadmap to their front doors.

c.    **Small Town Privacy Destruction**: For users in smaller communities, anonymity wasn't just a preference—it was protection. In towns where "everyone knows everyone," the ability to warn others without being identified was crucial. The breach destroyed that protection forever.

d.    **Years of Private Communications Weaponized**: The exposure of 1.1 million direct messages created unprecedented privacy violations. Women who had used Tea's messaging feature to privately discuss sensitive matters—including reproductive health decisions, experiences with sexual assault, and safety concerns about specific men—now faced the horror of having these conversations in the hands of malicious actors. Messages that included phone

numbers, photos, and/or other identifying details destroyed any hope of maintaining anonymity. The exposure of these private conversations could put women's lives at risk.

e. **The Deepfake Nightmare**: In 2025, artificial intelligence can create convincing fake videos from a single photo. Women whose data was exposed now face the terrifying possibility of seeing themselves in pornographic deepfakes or fraudulent videos.

191.    The psychological harm is equally devastating. Women who trusted Tea with their most sensitive information now live in constant fear. Every unknown phone call could be a stalker who found their number. Every piece of mail could be evidence of identity theft. Every knock on the door could be retaliation for a warning they posted. The safety app has made them perpetually unsafe. *See In re U.S. Office of Personnel Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 55 (D.C. Cir. 2019) (recognizing ongoing harm from data breach). Women who had been victims of violence, and physical, sexual or emotional abuse, experiences that compelled them to subscribe to the Tea app, are now forced to remember and re-live the trauma of the underlying violations as they navigate the threats caused by the Data Breach.

192.    Making matters worse, the data can never be fully contained. While a breached credit card can be cancelled, the images Tea exposed will circulate forever. They're on 4chan archives. They're in torrent files. They're on hard drives around the world. They're in the hands of people who wish these women harm. No security service can fully protect against a threat that's already everywhere.

## G.   The Technical Post-Mortem: A Masterclass in What Not to Do

193.    As security researchers and journalists investigated the breach, a pattern of shocking negligence emerged. This wasn't a sophisticated attack by nation-state hackers. This wasn't a zero-day vulnerability that no one could have anticipated. This was basic Security 101 stuff that Tea simply ignored.

194.    First, the Firebase misconfiguration. Google's documentation is crystal clear about storage bucket security. It has a section called "Understand Firebase Security Rules for Cloud Storage" with templates for common scenarios. Google Cloud Firebase, *Security Rules for Cloud Storage*, *supra*. Setting proper access controls takes minutes. Tea either never bothered to look or looked and decided user security wasn't worth those minutes.

AMENDED CLASS ACTION COMPLAINT

195.    Second, the complete absence of monitoring. Tea apparently had no idea their data was being massively exfiltrated until reporters told them. They should have had alerts for unusual access patterns, warnings about large download volumes, or logs showing who was accessing what. It's like having a bank vault with no cameras, no alarms, and no guards.

196.    Third, the data retention disaster. Even if Tea had some legitimate reason to keep verification data (which it has never adequately explained), despite explicitly promising its users it would delete such data, why keep it all in one place? Why not encrypt it? Why not segregate it from production systems? Why not implement access controls so only specific employees could view it for specific reasons? The answer appears to be that Tea simply uploaded everything to Firebase and forgot about it.

197.    Fourth, the "vibe coding" problem. Multiple security experts who reviewed the breach concluded that Tea likely used AI-generated code for their Firebase implementation. The telltale signs were all there: functional code that worked but lacked basic security considerations, default configurations left unchanged, no evidence of security review or testing. It's what happens when startups prioritize speed over safety, when they trust ChatGPT more than security professionals.

198.    Perhaps most damning is what Tea did have resources for. While it couldn't spare the time to secure user data, it had plenty of resources for marketing. While it couldn't hire security professionals, it could afford to grow their business to millions of users. The breach wasn't caused by lack of resources— it was caused by lack of caring.

### H.    The Aftermath: A Privacy Disaster That Keeps Getting Worse

199.    In the days and weeks following the initial breach, the situation continued to deteriorate. The data didn't just exist on 4chan—it spread like wildfire across X, other social media platforms, and the internet's darkest corners. Discord servers organized the data by geographic location.

200.    Attempts to contain the spread proved futile. While major platforms like Reddit and X would sometimes remove direct links when reported, the data had already been downloaded thousands of times. For every link taken down, ten more appeared. For every torrent removed, mirrors emerged. The internet's decentralized nature, usually a strength, became a nightmare for the women whose data was exposed.

AMENDED CLASS ACTION COMPLAINT

201.    The role of X Corp. in perpetuating the harm cannot be overstated. This platform didn't just host the stolen data—it provided the infrastructure for its weaponization. On X, users created "Tea Breach" accounts dedicated to exposing specific women. The platform's failure to act swiftly and decisively transformed a data breach into an ongoing campaign of harassment and abuse.

202.    Certain individuals with access to the Tea data also created a map, pinpointing the locations of the exposed users. One such post told anyone viewing it to "enjoy." One post regarding this map stated: "If you've got access to the tea app leak, here is this map, here [sic] you can see where around you some of these retarded women decided so [sic] sign up, once clicking you can use the provided hashes to search their images in the leak ;)."

203.    Another person created a site for comparing and ranking the users' physical appearances. Posters across social-media platforms had a field day sharing Tea users' images, calling them "whales" and "ugly bitches," saying that they deserved all of this.

204.    Other posts were rife with more overt threats of violence and harassment. For instance, one post on X stated, in part: "Some people are willing to hunt you down and unalive you for the lies that you have told with no actual proof. They pinpointed all of your locations that should tell you how serious this is. […]."

205.    Another stated, "I hope there will be some who take it to the next level."

206.    Tea's response to these risks was entirely underwhelming and insufficient. In the notice letter it sent to the approximately 4,000 individuals who had their government ID information disclosed, Tea offered only two years of CyEx Financial Shield. But this product, offered to only a small subset of the plaintiff class, protects only against financial ID theft, and does not provide any remediation against cyberstalking or help curtail the proliferation of PII and offensive threats on social media.

207.    Further, Tea did not offer any kind of protection to the thousands of women who had their other private information and/or photos exposed. This is especially problematic because with the type of content exposed in the direct messages, it is "trivial to find social media profiles, telephone numbers, and the real-world identities of most users." Arntz, Pieter, *Tea Dating Advice app has users' private messages disclosed*, MalwarebytesLabs, (July 29, 2025) https://www.malwarebytes.com/blog/news/2025/07/tea-dating-advice-app-has-users-private-messages-disclosed.

AMENDED CLASS ACTION COMPLAINT

208.    For Plaintiffs, the ongoing nightmare manifests in daily anxiety. They are trapped in a prison of Tea's making, where every day brings new fears about how their exposed data might be used against them.

209.    The breach also had a chilling effect on women's safety more broadly. News of Tea's failure spread quickly through women's communities. The message was clear: even apps specifically designed to protect women couldn't be trusted. The digital whisper network that Tea promised to enable had been compromised at its foundation. How many women chose not to warn others about dangerous men because they'd seen what happened to Tea users? How many predators escaped accountability because their victims were too afraid to speak up, even anonymously? The harm ripples outward in ways we'll never fully measure.

## **CLASS ALLEGATIONS**

210.    Plaintiffs bring this action individually and as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of themselves and the following class:

> **The Nationwide Class:** All persons residing in the United States whose personally identifiable information was exposed in the Tea data breach announced on or about July 25, 2025.

211.    Plaintiffs bring this action individually and as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of themselves and the following subclass:

> **The DPPA Subclass:** All persons residing in the United States whose driver's licenses were exposed in the Tea data breach announced on or about July 25, 2025.

212.    Plaintiffs Jane Doe, Jane Doe 2, Jane Doe 3, and Jane Doe 20 bring this action individually and as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of themselves and the following subclass:

> **The California Subclass**: All members of the Nationwide Class who are citizens of California.

213.    Plaintiff Jane Doe 11 brings this action individually and as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of herself and the following class:

> **The New York Subclass**: All members of the Nationwide Class who are citizens of New York.

214.    Plaintiffs Jane Doe 12, Jane Doe 13, and Jane Doe 14 bring this action individually and as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of themselves and the following subclass:

> **The North Carolina Subclass**: All members of the Nationwide Class
> who are citizens of North Carolina

215.    Plaintiffs Jane Doe 6, Jane Doe 7, Jane Doe 8, Jane Doe 9, and Jane Doe 10 bring this action individually and as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of themselves and the following subclass:

> **The Illinois Subclass**: All members of the Nationwide Class who are
> residents of Illinois.

216.    Excluded from the classes are Defendants, including any entity in which any Defendant has a controlling interest, is a parent or subsidiary, or which is controlled by any Defendant, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of any Defendant. Also excluded are the judges and court personnel in this case and any members of their immediate families.

217.    Plaintiffs reserve the right to expand, limit, modify, or amend the proposed definitions of the classes or subclasses before the Court determines whether certification is appropriate.

218.    The classes meet the requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2), and (b)(3) for all of the following reasons:

219.    <u>Numerosity</u>. Although the exact number of class members is uncertain, and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable, believed to amount to many thousands of persons. The disposition of the claims of these class members in a single action will provide substantial benefits to all parties and the Court. Information concerning the exact size of the putative classes is within the possession of Defendant Tea. The parties will be able to identify each member of the classes through discovery, including through Defendant Tea's document production and/or related discovery.

220.    <u>Commonality</u>. There are questions of law and fact common to each class that predominate over any questions affecting only individual members, including:

a.  Whether and to what extent Defendant Tea had a duty to protect Plaintiffs' and class members' PII;

b.  Whether Defendant Tea breached its duty to protect Plaintiffs' and class members' PII;

c.  Whether Defendant Tea's data security systems prior to the Data Breach met the requirements of relevant laws;

d.  Whether Defendant Tea's data security systems prior to the Data Breach met industry standards;

e.  Whether Defendant Tea violated DPPA by disclosing Plaintiffs' driver's license images and numbers;

f.  Whether Defendant X owed duties to prevent the dissemination of stolen PII on its platform or prohibit harassing or violent content;

g.  Whether Defendant X breached those duties by failing to take adequate measures to prevent the spread of Plaintiffs' and class members' PII or remove harassing or violent content;

h.  Whether the actions and or/inaction of Defendants caused Plaintiffs' and class members' PII to be disclosed or compromised;

i.  Whether Defendants were negligent;

j.  Whether Plaintiffs and other class members are entitled to injunctive relief, including injunctions requiring Defendant X to remove any PII from the Data Breach from its platform and remove any information it has promised to prohibit from its platform, and ; requiring Tea and Defendant X to work cooperatively with one another to achieve these goals; and

k.  Whether Plaintiffs and other class members are entitled to damages as a result of Defendants' conduct.

221.  <u>Typicality</u>. All of Plaintiffs' claims are typical of the claims of the proposed classes they seek to represent in that: Plaintiffs' claims arise from the same practice or course of conduct that forms the basis of the classes' claims; Plaintiffs' claims are based upon the same legal and remedial theories as the proposed classes and involve similar factual circumstances; there is no antagonism between the interests of Plaintiffs and absent class members; the injuries that Plaintiffs suffered are similar to the injuries that class members have suffered.

222.  <u>Adequacy</u>. Plaintiffs will fairly and adequately protect the interests of the classes they seek to represent. Plaintiffs have retained counsel experienced in complex class action litigation, including data

breach and consumer protection cases. Plaintiffs have no interests that are contrary to or in conflict with those of the classes.

223.    <u>Predominance</u>. The proposed class action meets the requirements of Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the classes predominate over any questions which may affect only individual class members.

224.    <u>Superiority</u>. The proposed class action also meets the requirements of Federal Rule of Civil Procedure 23(b)(3) because a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions is superior to multiple individual actions or piecemeal litigation, avoids inconsistent decisions, presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each class member. Absent a class action, the majority of class members would find the cost of litigating their claims prohibitively high and would have no effective remedy.

225.    Plaintiffs' claims also meet the requirements of Federal Rule of Civil Procedure 23(b)(1) because prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications that would establish incompatible standards for Defendants. Varying adjudications could establish incompatible standards with respect to: whether Defendants' ongoing conduct violates the claims alleged herein; and whether the injuries suffered by class members are legally cognizable, among others. Prosecution of separate actions by individual class members would also create a risk of individual adjudications that would be dispositive of the interests of other class members not parties to the individual adjudications, or substantially impair or impede the ability of class members to protect their interests.

226.    <u>Injunctive Relief</u>. This action also satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the classes, thereby making injunctive and declaratory relief appropriate with respect to each class as a whole. Class members continue to face ongoing harm from the exposure of their PII and require injunctive relief to address Defendants' inadequate security practices, breach response, and failure to prevent ongoing dissemination of highly sensitive PII.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**Negligence**
**(On Behalf of Plaintiffs and the Nationwide Class Against All Defendants)**

227.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

228.    Defendant Tea required Plaintiffs and the class members to submit highly sensitive, non-public PII to Defendant in order to use the Tea app.

229.    Defendant Tea owed a duty to Plaintiffs and to the class to exercise reasonable care in obtaining, securing, safeguarding, properly disposing of and protecting Plaintiffs' and class members' PII within its control from being compromised by or being accessed by unauthorized third parties. This duty arose from multiple sources, beginning with Defendant Tea's voluntary assumption of this duty by marketing itself as a "safety" app and promising to protect user data.

230.    The duty was further established by the special relationship created when Defendant Tea required Plaintiffs and class members to provide highly sensitive PII as a condition of using the Tea app. The foreseeable harm that would result from a breach of such sensitive information, particularly given Tea's user base of women reporting dangerous men, created an enhanced duty of care.

231.    Defendant Tea alone was in a position to ensure that its systems were sufficient to protect against the harm to Plaintiffs and other class members from the Data Breach.

232.    In addition, Defendant Tea had a duty to use reasonable security measures under Section A of the Federal Trade Commission Act (FTCA), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

233.    Defendant Tea's duty to use reasonable care in protecting the PII arose not only as a result of the common law and the statutes and regulations described above, but also because it is bound by, and has committed to comply with, industry standards for the protection of confidential information.

234.    Defendant Tea breached its common law, statutory, and other duties—and thus, was negligent—by failing to use reasonable measures to protect its customers' PII, and by failing to provide

timely notice of the Data Breach. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

    a.   failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs' and the class members' PII;

    b.   failing to adequately monitor the security of its networks and systems; and

    c.   allowing unauthorized access to Plaintiffs' and the class members' PII.

235. Defendant X similarly owed duties to Plaintiffs and class members once it became aware that stolen personal information was being disseminated on its platform. These duties arose from the platform's ability to control and remove content, combined with the foreseeability that failing to act would perpetuate and amplify the harm. Defendant X also owed duties to Plaintiffs and class members as a result of its public promises and assurances to prohibit and take action upon certain content, like private information, threats of violence, and harassing posts, as alleged in more detail below in the Seventh Cause of Action, which allegations are incorporated here by reference.

236. Public policy against facilitating identity theft and harassment further established these duties, as did industry standards for content moderation and user protection.

237. Defendant Tea owed a duty of care to the Plaintiffs and the members of the class because they were foreseeable and probable victims of any inadequate security practices.

238. It was foreseeable that Defendant Tea's failure to use reasonable measures to protect PII and to provide timely notice of the Data Breach would result in injury to Plaintiffs and other class members. Further, the breach of security, unauthorized access, and resulting injury to Plaintiffs and the members of the class were reasonably foreseeable.

239. It was therefore foreseeable that the failure to adequately safeguard PII would result in one or more of the following injuries to Plaintiffs and the members of the proposed class: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the deep web black market; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses

1  and/or time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; and other

2  economic and non-economic harm.

3      240.    Defendants breached their duties of care through a cascade of failures. Defendant Tea knew

4  or reasonably should have known of the inherent risks in collecting and storing the PII of Plaintiffs and

5  members of the class and the critical importance of providing adequate security of that information, yet

6  despite the foregoing had inadequate cyber-security systems and protocols in place to secure the PII.

7  Defendant Tea unlawfully breached its duty to use reasonable care to protect and secure the PII of

8  Plaintiffs and the class by marketing the Tea app as "safe" and secure, and then failing to implement basic

9  security measures to protect Plaintiffs' and class members' PII.

10     241.    Defendant X's breaches of its duties were equally serious. Defendant X failed to promptly

11 remove posts containing stolen PII, allowed the creation of accounts dedicated to exposing Tea breach

12 victims, and failed to implement systematic measures to prevent the spread of stolen PII. Most tellingly,

13 Defendant X prioritized user engagement over user safety by allowing PII taken from the Data Breach go

14 viral, treating stolen identity documents as just another form of trending content.

15     242.    Defendants' breaches were substantial factors in causing Plaintiffs' and class members'

16 injuries. But for Tea's failure to implement basic security measures, the breach would not have occurred.

17 But for X Corp.'s failure to prevent dissemination and harassing and violent speech, the harm would have

18 been limited or contained. The causal chain is direct and unbroken.

19     243.    As a direct and proximate result of Defendants' negligence, Plaintiffs and class members

20 have been seriously and permanently damaged by the Data Breach. Specifically, Plaintiffs and members

21 of the class have been injured by, among other things; (1) the exposure of their PII, including identification

22 information such as home addresses, to online threat actors; (2) the loss of the ability to control how their

23 PII is used; (3) compromise, publication and/or theft of Plaintiffs' and class members' PII; (4) out-of-

24 pocket costs associated with the prevention, detection and recovery from identity theft and/or unauthorized

25 use of financial and medical accounts; (5) lost opportunity costs associated with their efforts expended

26 and the loss of productivity from addressing as well as attempting to mitigate the actual and future

27 consequences of the Data Breach including, but not limited to, efforts spent researching how to prevent,

28 detect, and recover from PII misuse; (6) costs associated with the ability to use credit and assets frozen or

flagged due to credit misuse, including complete credit denial and/or increased cost of the use, the use of credit, credit scores, credit reports, and assets; (7) continued risks to their PII, which remains in Defendants' possession and may be subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect the PII in their possession; and (8) future costs in terms of time, effort and money that will be spent trying to prevent, detect, contest and repair the effects of the PII compromised as a result of the Data Breach as a remainder of the Plaintiffs' and class members' lives.

244.    Plaintiffs and the class seek damages, injunctive relief, and other and further relief as the Court may deem just and proper.

## SECOND CAUSE OF ACTION

### Negligence Per Se
### (On Behalf of Plaintiffs and the Nationwide Class Against Defendant Tea)

245.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

246.    Defendant Tea's duties arise from, *inter alia*, Section 5 of the FTCA, 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by business, such as Tea, of failing to employ reasonable measures to protect and secure PII.

247.    Defendant Tea violated Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiffs' and other class members' PII and not complying with applicable industry standards. Defendant Tea's conduct was particularly unreasonable given the nature and amount of PII it obtains and stores, and the foreseeable consequences of a data breach involving PII including, specifically, the substantial damages that would result to Plaintiffs and other class members.

248.    Defendant Tea's violation of Section 5 of the FTCA constitutes negligence *per se*.

249.    Plaintiffs and class members are within the class of persons that Section 5 of the FTCA was intended to protect.

250.    The harm occurring as a result of the Data Breach is the type of harm Section 5 of the FTCA was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or

deceptive practices, caused the same type of harm that has been suffered by Plaintiffs and other class members as a result of the Data Breach.

251.    It was reasonably foreseeable to Defendant Tea that its failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiffs' and class members' PII to unauthorized individuals.

252.    The injury and harm that Plaintiffs and the other class members suffered was the direct and proximate result of Defendant's violations of Section 5 of the FTCA. Plaintiffs and class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII; (iii) breach of the confidentiality of their PII; (iv) deprivation of the value of their PII, for which there is a well-established national and international market; and/or (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

### THIRD CAUSE OF ACTION

**Invasion Of Privacy by Intrusion**
**(On Behalf of Plaintiffs and the Nationwide Class Against Defendant Tea)**

253.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

254.    The Restatement (Second) of Torts states:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

Restatement (Second) of Torts § 652B (1977).

255.    Plaintiffs and the class members had a reasonable expectation of privacy in the PII Defendant Tea mishandled.

AMENDED CLASS ACTION COMPLAINT

256.    By intentionally failing to keep Plaintiffs' and the class members' PII safe, and by intentionally misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendant Tea intentionally invaded Plaintiffs' and class members' privacy by intrusion.

257.    Defendant Tea knew that ordinary persons in Plaintiffs' or the class members' positions would consider its actions an invasion of privacy and its intentional actions highly offensive and objectionable.

258.    Defendant Tea invaded Plaintiffs' and the class members' right to privacy and intruded into Plaintiffs' and the class members' private affairs by intentionally misusing and/or disclosing their PII without their informed, voluntary, affirmative, and clear consent.

259.    Defendant Tea intentionally concealed from Plaintiffs and the class members an incident that misused and/or disclosed their PII without their informed, voluntary, affirmative, and clear consent.

260.    In failing to protect Plaintiffs' and the class members' PII, and in intentionally misusing and/or disclosing their PII, Defendant Tea acted with intentional malice and oppression and in conscious disregard of Plaintiffs' and the class members' rights to have such information kept confidential and private.

261.    Plaintiffs and the class members sustained damages (as outlined above) as a direct and proximate consequence of the invasion of their privacy by intrusion, and therefore seek an award of damages.

## **FOURTH CAUSE OF ACTION**

### **Breach Of Implied Contract**
### **(On Behalf of Plaintiffs and the Nationwide Class Against Defendant Tea)**

262.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

263.    Plaintiffs and members of the class were required to provide, and did provide, their PII to Defendant Tea as a condition of using the Tea app.

264.    Plaintiffs and members of the class had no alternative and did not have any bargaining power with regard to providing their PII. Defendant Tea required disclosure of their PII as a condition to access and use of the Tea app, which the Plaintiffs and members of the class did.

265.    When Plaintiffs and class members provided their PII to Defendant Tea in exchange for access and use of the Tea App, they entered into implied contracts with Defendant pursuant to which Defendant Tea agreed to safeguard and protect such PII and to timely and accurately notify them if their data had been breached and compromised.

266.    Defendant Tea solicited prospective users to provide their PII as part of its regular business practices. These individuals accepted Defendant's offers and provided their PII to Defendant Tea. In entering into such implied contracts, Plaintiffs and the class reasonably assumed that Defendant's data security practices and policies were reasonable and consistent with industry standards, and that Defendant Tea would use part of the funds received from Plaintiffs and the class to pay for adequate and reasonable data security practices.

267.    Further, Defendant Tea made various promises to Plaintiffs and the class by way of its Privacy Policy, which indicated that the data obtained for verification purposes would be deleted as soon as the verification process was complete.

268.    Plaintiffs and the class would not have provided and entrusted their PII to Defendant Tea in the absence of the implied contract between them and Defendant Tea to keep the information secure and delete the information it no longer needed for legitimate business purposes.

269.    Plaintiffs and the class fully performed their obligations under the implied contracts with Defendant Tea.

270.    Defendant Tea breached its implied contracts with Plaintiffs and the class by failing to safeguard and protect their PII, failing to timely delete PII that was no longer needed, and by failing to provide timely and accurate notice that their personal information was compromised as a result of the Data Breach.

271.    As a direct and proximate result of Defendant Tea's breaches of its implied contracts, Plaintiffs and the class sustained actual losses and damages as described herein.

272.    Plaintiffs and the class seek damages, injunctive relief, and other and further relief as the Court may deem just and proper.

AMENDED CLASS ACTION COMPLAINT

**FIFTH CAUSE OF ACTION**

**Violation Of the Driver's Privacy Protection Act, 18 U.S.C. §§ 2724,** *et seq.*
**(On Behalf of Plaintiffs and the DPPA Subclass Against Defendant Tea)**

273.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

274.    The DPPA provides that "[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains . . . ." 18 U.S.C. § 2724.

275.    The DPPA also restricts the resale and redisclosure of personal information, and requires authorized recipients to maintain records of each individual and the permitted purpose of the disclosure for a period of five years. 18 U.S.C. § 2721(c).

276.    Under the DPPA, a "'motor vehicle record' means any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles." 18 U.S.C. § 2725(1). Driver's license numbers are motor vehicle records and "personal information" under the DPPA. 18 U.S.C. § 2725(3).

277.    Pursuant to the allegations herein, Defendant Tea knew or should have known that it obtained, disclosed or re-disclosed, and used PII from a motor vehicle record for a purpose not permitted under the DPPA.

278.    By engaging in the conduct described above, Defendant Tea knowingly obtained personal information for a purpose not permitted under the DPPA.

279.    By engaging in the conduct described above, Defendant Tea knowingly used personal information for a purpose not permitted under the DPPA.

280.    By engaging in the conduct described above, Defendant Tea knowingly disclosed or re-disclosed personal information for a purpose not permitted under the DPPA.

281.    As a result of Defendant Tea's acquisition, use, subsequent Data Breach, and violations of the DPPA, Plaintiffs and putative class members are entitled to statutory damages to maximum allowable, actual damages, liquidated damages, and attorneys' fees and costs.

AMENDED CLASS ACTION COMPLAINT

**SIXTH CAUSE OF ACTION**

**Violations of California's Unfair Competition Law,**
**Cal. Bus. & Prof. Code § 17200 et seq.**
**(On Behalf of Plaintiffs and the Nationwide Class Against Defendant Tea)**

282.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

283.    Defendant Tea is a "person" as that term is defined by, *inter alia*, Cal. Bus. & Prof. Code § 17201.

284.    Defendant Tea violated the California Unfair Competition Law ("UCL"), §§ 17200, *et seq.*, by engaging in unlawful, unfair, and deceptive business acts and practices.

285.    Defendant Tea's unlawful, unfair, and deceptive acts and practices include: Tea's failure to implement and maintain reasonable data security policies, practices, and measures to protect the PII of Plaintiffs and class members from unauthorized access, disclosure, release, and theft, which was a direct and proximate cause of the Data Breach.

286.    Defendant Tea failed to:

a.    Secure access to its computer systems and database;

b.    Comply with relevant industry standards for data and network security practices;

c.    Adequately secure or segment its company network(s);

d.    Implement adequate system and event monitoring over its computer systems;

e.    Timely update and patch relevant programs related to its computer systems; and

f.    Implement the systems, policies, and procedures necessary to prevent a foreseeable security intrusion such as the Data Breach.

287.    Defendant Tea failed to identify and take adequate precautions against foreseeable security risks or to adequately improve its data security.

288.    Defendant Tea's lackluster security provides little, if any utility, and is particularly unfair within the meaning of the UCL when weighed against the resultant harm to Plaintiffs and class members.

289.    Defendant Tea's inadequate security is also contrary to legislatively declared public policy that seeks to protect consumer data and ensure that entities that are trusted with it use appropriate security measures, as reflected in laws, including, *inter alia*, the FTCA, 15 U.S.C. § 45, California's Consumer

- 54 -

Records Act, Cal. Civ. Code §§ 1798.81.5, 1798.82, and California's Consumer Privacy Act, Cal. Civ. Code §§ 1798.100 *et seq.*

290.    Defendant Tea's failure to implement and maintain reasonable data security policies, procedures, and measures, also lead to substantial injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition as contemplated under the UCL. Because Plaintiffs and the class members did not and could not know of Defendant Tea's inadequate security and compromise of their PII, they could not have reasonably avoided the harms caused by Defendant Tea.

291.    Defendant Tea misrepresented that it would protect the privacy and confidentiality of Plaintiffs' and class members' PII, yet failed to do so. Defendant Tea further omitted, suppressed, and/or concealed the material fact that it did not reasonably or adequately secure Plaintiffs' and class members' PII.

292.    Defendant Tea made promises to its users that it would delete their highly sensitive verification images upon completion of the verification process, and yet thousands of verification images were retained and exposed in the Data Breach.

293.    Defendant Tea misrepresented that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and class members' PII, including all such duties as imposed by the FTCA, 15 U.S.C § 45; the DPPA, 18 U.S.C. §§ 2724, *et seq.*; California's Customer Records Act, Cal. Civ. Code §§ 1798.80, *et seq.*; and California's Consumer Privacy Act, Cal. Civ. Code §§ 1798.100 *et seq.*, yet failed to do so. Defendant Tea further omitted, suppressed, and/or concealed the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and class members' PII, including the duties imposed by the aforementioned statutes.

294.    Defendant Tea engaged in unlawful business practices by violating Cal. Civ. Code § 1798.82.

295.    Defendant Tea's misrepresentations and omissions to Plaintiffs and the class members were material because they were likely to deceive reasonable individuals about the adequacy of Defendant's data security and ability to protect the privacy of their PII.

296.    Defendant Tea intended to mislead Plaintiffs and members of the class and induce them to rely on its misrepresentations and omissions.

297.    If Defendant Tea had disclosed to Plaintiffs and members of the class that its computer and data systems were not secure and, thus, vulnerable to cyberattack, Defendant Tea would have been unable to continue in business with such inadequate security policies, practices, and measures, and it would have been forced to adopt reasonable cybersecurity measures, in compliance with the law. However, Defendant Tea instead received, maintained, and compiled Plaintiffs' and the class members' PII as a condition of using the Tea app without advising Plaintiffs and class members that Defendant's data security practices were insufficient to maintain the safety and confidentiality of their PII. Accordingly, Plaintiffs and class members acted reasonably in relying on Defendant Tea's misrepresentations and omissions, the veracity of which they could not have discovered prior to the Data Breach.

298.    Defendant Tea acted intentionally, knowingly, and maliciously to violate the UCL in reckless disregard of Plaintiffs' and class members' rights.

299.    As a direct and proximate result of Defendant Tea's violations of the UCL, Plaintiffs and the class sustained actual losses and damages as described herein.

300.    Plaintiffs and the class seek damages, injunctive relief, and other and further relief as the Court may deem just and proper.

301.    Plaintiffs bring this Cause of Action on behalf of all class members pursuant to UCL § 17203, which authorized extraterritorial application of the UCL.

## SEVENTH CAUSE OF ACTION
### Breach of Third-Party Beneficiary Contract
### (On Behalf of Plaintiffs and the Nationwide Class Against Defendant X Corp.)

302.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

303.    Defendant X Corp. made various promises via its X's Terms of Service,[5] its X Rules, its Hateful Conduct policy, its Private Content policy, and its Abuse and Harassment policy regarding its moderation and removal of harmful content, threatening content, or content that discloses private information.

304.    Under those contracts, Defendant X promised to prohibit certain conduct, as set forth in X's various policies.

---

[5] *Terms of Service*, X, https://x.com/en/tos (last accessed Sept. 23, 2025) (emphasis added).

305.    Defendant X also explicitly recognizes, in "X Rules"—that "[v]iolence, harassment and other similar types of behavior discourage people from expressing themselves, and ultimately diminish the value of global public conversation," and promises that its rules are in place to "ensure all people can participate in the public conversation freely and safely."[6]

306.    The X Rules specifically prohibit content "threatening, inciting, glorifying, or expressing desire for violence," or that "attack[s] other people on the basis of race, ethnicity, national origin, caste, sexual orientation, gender, gender identity, religious affiliation, age, disability, or serious disease."[7]

307.    The X Rules go on to state:

> You may not publish or post other people's private information (such as home phone number and address) without their express authorization and permission. We also prohibit threatening to expose private information or incentivizing others to do so.[8]

308.    X's Hateful Conduct policy promises a commitment to combating abuse and a prohibition on abusive behavior:

> We are committed to combating abuse motivated by hatred, prejudice or intolerance, particularly abuse that seeks to silence the voices of those who have been historically marginalized. For this reason, we prohibit behavior that targets individuals or groups with abuse based on their perceived membership in a protected category.

309.    Its Hateful Conduct policy promises that X will "review and take action against reports of accounts targeting an individual or group of people with any of the following behavior, whether within Posts or Direct Messages":

> Hateful references
>
> We prohibit targeting individuals or groups with content that references forms of violence or violent events where a protected category was the primary target or victims, where the intent is to harass. […]
>
> Incitement

---

[6] *The X Rules*, X Help Center, https://help.x.com/en/rules-and-policies/x-rules (last accessed Sept. 23, 2025).

[7] *Id*.

[8] *Id*.

AMENDED CLASS ACTION COMPLAINT

We prohibit inciting behavior that targets individuals or groups of people belonging to protected categories. This includes: […]

- inciting others to harass members of a protected category on or off platform […][9]

Slurs and Tropes

We prohibit targeting others with repeated slurs, tropes or other content that intends to degrade or reinforce negative or harmful stereotypes about a protected category. In some cases, such as (but not limited to) severe, repetitive usage of slurs, or racist/sexist tropes where the context is to harass or intimidate others, we may require Post removal. In other cases, such as (but not limited to) moderate, isolated usage where the context is to harass or intimidate others, we may limit Post visibility as further described below.

Dehumanization

We prohibit the dehumanization of a group of people based on their religion, caste, age, disability, serious disease, national origin, race, ethnicity, gender, gender identity, or sexual orientation.

310.    Under X's Private Content policy, X promises that it will remove content that shares another person's private information, if the individual did not consent to having that media shared. In using the X platform:[10]

**[Users] may not threaten to expose, incentivize others to expose, or publish or post other people's private information without their express authorization and permission, or share private media of individuals without their consent.**

Sharing someone's private information online without their permission, sometimes called "doxxing," is a breach of their privacy and can pose serious safety and security risks for those affected.

Additionally, posting images is an important part of our users' experience on X. However, where individuals have a reasonable expectation of privacy in an individual piece of media, we believe they should be able to determine whether or not it is shared. When we are notified by individuals depicted, or their

---

[9] *Hateful Conduct*, X Help Center, https://help.x.com/en/rules-and-policies/hateful-conduct-policy (last accessed Sept. 23, 2025).

[10] *Private Content*, X Help Center, https://help.x.com/en/rules-and-policies/personal-information (last accessed Sept. 23, 2025).

authorized representative, that they did not consent to having media shared, we will remove the media. This policy is not applicable to public figures.[11]

311.    Further, X explicitly lists specific actions that may violate its Private Content policy, and which X would therefore be required to review and/or remove, including:

**What is in violation of this policy?**

**Posting Private Information**

You cannot share the following types of private information without the permission of the person it belongs to:

- home address or physical location information, such as street addresses, GPS coordinates, or other identifying information related to locations that are considered private

- identity documents, such as government-issued IDs or social security or other national identity numbers

- contact information, such as non-public personal phone numbers, email addresses, or passwords

- financial account information, such as bank account or credit card details

- health-related private information, such as biometric data or medical records

- the identity of an anonymous user, such as their name or media depicting them

The following behaviors are also not permitted:

- threatening to publicly expose someone's private information

- sharing information that would enable individuals to hack or gain access to someone's private information without their consent, such as sharing login credentials for online banking services

- asking for or offering a bounty or financial reward in exchange for posting someone's private information

- asking for a bounty or financial reward in exchange for not posting someone's private information, sometimes referred to as blackmail.[12]

---

[11] *Id.*

[12] *Id.*

AMENDED CLASS ACTION COMPLAINT

312.    Under X's Abuse and Harassment policy, X promises that it "prohibit[s] behavior that encourages others to harass or target specific individuals or groups of people with abuse. This includes but is not limited to: calls to target people with abuse or harassment online and behavior that urges offline action, such as physical harassment."[13]

313.    For all of these various policies, X has a set range of enforcement options, including post-level enforcement, direct message-level enforcement, and account-level enforcement.[14]

314.    In addition to the rules, it promises to enforce on its platform, X also made various representations to the public about the safety of its platform and its dedication to keeping the public from being harassed, abused, or having their private information exposed on its platform. In its H2 2024 Global Transparency Report it represents that it "take[s] swift action against any violations to ensure a safe space for everyone," and that it "enforce[s] strict measures to safeguard personal privacy and prevent unauthorized disclosures."[15]

315.    The contracts between Defendant X and its users, as set forth above, were made expressly for the benefit of any individual who is the target of prohibited behavior, including non-users. That Plaintiffs and class members would rely on the contracts between Defendant X and its users to ensure the security of their sensitive and private PII was foreseeable to Defendant X.

316.    Defendant X breached its contracts when it failed to uphold its promises to protect Plaintiffs' and class members' PII from unauthorized dissemination in the X platform, among other things.

## **EIGTH CAUSE OF ACTION**

### **Declaratory and Injunctive Relief**
### **(On Behalf of Plaintiffs and the Nationwide Class Against All Defendants)**

317.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

---

[13] *Abuse and Harassment*, X Help Center, https://help.x.com/en/rules-and-policies/abusive-behavior (last accessed Sept. 23, 2025).

[14] *See Our Range of Enforcement Options*, X Help Center, https://help.x.com/en/rules-and-policies/enforcement-options (last accessed Sept. 23, 2025).

[15] *H2 2024 Global Transparency Report*, X, https://transparency.x.com/en/reports/global-reports/2025-transparency-report#abuse-harassment-and-hateful-conduct (last accessed Sept. 23, 2025).

318.     Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court may enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Moreover, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

319.     An actual controversy exists between Plaintiffs and class members on one hand, and Defendants on the other, regarding Defendants' data security practices, content moderation obligations, and duties going forward.

320.     The harm to Plaintiffs and class members is ongoing and irreparable. Their PII remains exposed on the internet and to cybercriminals. They face continuing risks of identity theft, fraud, stalking, and harassment. Without injunctive relief, Defendants are likely to continue their inadequate practices, putting current and future users at risk.

321.     Plaintiffs and class members have no adequate remedy at law. Money damages cannot undo the exposure of their PII or eliminate the ongoing risks they face. Only prospective relief can prevent further harm and ensure Defendants implement adequate measures.

322.     Plaintiffs seek a declaration that:

a.   Defendant Tea's data security practices violated and continue to violate its legal obligations;

b.   Defendant X Corp. has obligations to prevent the dissemination of stolen personal information on their platforms and to comply with its promises to remove violent or harassing content or unauthorized personal media;

c.   All Defendants must implement comprehensive measures to protect users from data breaches and their consequences;

d.   Defendant Tea must delete all unnecessary personal information in its possession;

e.   All Defendants must provide transparent disclosures about their practices;

f.   All Defendants must submit to regular audits by qualified third parties.

323.     Plaintiffs further seek injunctive relief requiring Defendants to implement comprehensive remedial measures. As to Tea, Plaintiffs seeks an order requiring immediate implementation of

comprehensive information security measures, including encryption of all PII at rest and in transit, access controls limiting who can view sensitive data, regular security audits and penetration testing, employee training on data security, incident response procedures, and data minimization and retention policies. Tea must also delete all personal information that is no longer necessary for legitimate business purposes, provide clear and conspicuous notice to users about what data is collected, how it is used, how long it is retained, and how it is protected, implement a comprehensive information security program that is reasonably designed to protect the security, confidentiality, and integrity of personal information, and engage third-party security auditors to assess compliance and publish the results.

324.    As to X Corp., Plaintiffs seek injunctive relief requiring these platforms to implement systems to detect and remove stolen PII including government IDs and other personally identifiable data from their platforms, develop and enforce policies prohibiting the dissemination of stolen personal information, provide clear reporting mechanisms for victims of data breaches, and remove content that it has promised to prohibit.

325.    Plaintiffs and class members continue to suffer injury as a result of Defendant's negligent exposure of their PII and remain at imminent risk that further compromises of their PII will occur in the future.

326.    Additionally, Plaintiffs' and class members' PII, when contained in electronic form, is highly attractive to criminals who can nefariously use their PII for fraud, identity theft, and other crimes without their knowledge and consent.

327.    Plaintiffs seek a judgment declaring:

      a.    That Defendant owes a legal duty to reasonably and adequately secure Plaintiffs' and class members' PII.

      b.    That Defendant's past and present data security policies, practices, and measures do not comply with its contractual obligations and duties of care to reasonably and adequately secure Plaintiffs' and class members' PII.

      c.    That Defendant continues to breach its contractual obligations and duties of care by failing to implement reasonable and adequate data security policies, practices, and measures to safeguard Plaintiffs' and class members' PII.

328.    Plaintiffs further seek an injunction from this Court compelling Defendant to implement cyber-security policies and procedures equal to or better than industry standards.

329.    As alleged herein, the failures of the Defendant to implement adequate cyber-security measures and protocols has led to the compromise of the PII that Plaintiffs and members of the classes were required to provide as a condition of obtaining services from Defendant, resulting in irreparable harm.

330.    Defendants remain in possession of the PII of Plaintiffs and the classes. It is imperative that the Court intervene to assure that the Defendant takes all reasonable steps to protect that PII lest there be another data breach.

331.    The balance of equities tips decidedly in Plaintiffs' favor. The burden on Defendants of implementing proper security and content moderation measures is minimal compared to the enormous ongoing harm to class members from continued exposure of their personal information.

332.    Injunctive relief would serve the public interest by protecting consumers' personal information, preventing the weaponization of data breaches, and enforcing minimum standards for companies that collect sensitive data and platforms that can amplify harm.

333.    The hardship to Plaintiffs and class members if such an injunction is not issued exceeds the hardship to Defendants if an injunction is issued. Absent an injunction, Plaintiffs will likely be subjected to substantial identity theft and other damage, whereas the cost to Defendant of complying with an injunction by employing reasonable data security policies, practices, and measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

## NINTH CAUSE OF ACTION

**Violation Of the California Consumer Records Act**
**Cal. Civ. Code §§ 1798.80, *et seq*.**
**(On Behalf of Plaintiffs Jane Doe, Jane Doe 2, Jane Doe 3, Jane Doe 20**
**and the California Subclass Against Defendant Tea)**

334.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

335.    This claim is pleaded on behalf of Plaintiffs Jane Doe, Jane Doe 2, Jane Doe 3, and Jane Doe 20 ("Plaintiffs" for the purposes of this cause of action) and the California Subclass.

336.    The California Legislature enacted the California Consumer Records Act ("CRA"), Cal. Civ. Code §§ 1798.80, *et seq.*, "to ensure that Personal Information about California residents is protected." Cal. Civ. Code § 1798.81.5(a)(1).

337.    The CRA requires that "[a] business that owns, licenses, or maintains Personal Information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the Personal Information from unauthorized access, destruction, use, modification, or disclosure." Cal. Civ. Code § 1798.81.5(b).

338.    Defendant Tea maintains computerized data that includes PII, as defined by Cal. Civ. Code § 1798.80. This includes PII about Plaintiffs and California Subclass Members that was disclosed in the Data Breach. Cal. Civ. Code § 1798.81.5(d)(1)(A); Cal. Civ. Code § 1798.82.

339.    Pursuant to the CRA, Defendant Tea was required to "notify the owner or licensee of the information of the breach of the security of the data immediately following discovery, if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Cal. Civ. Code § 1798.82(b). The security breach notification must include "the types of Personal Information that were or are reasonably believed to have been the subject of the breach." Cal. Civ. Code § 1798.82.

340.    Defendant Tea reasonably believed that Plaintiffs' and the California Subclass Members' PII was acquired by unauthorized persons during the Data Breach. As such, Defendant Tea had an obligation under the CRA to disclose the Data Breach, immediately following its discovery, to Plaintiffs and California Subclass Members as the owners or licensees of the PII. Cal. Civ. Code § 1798.82.

341.    By willfully, intentionally, and/or recklessly failing to disclose the Data Breach immediately following its discovery, Defendant Tea violated Cal. Civ. Code § 1798.82.

342.    As a direct and proximate result of Defendant Tea's violations of the CRA, Plaintiffs and the California Subclass sustained actual losses and damages as described herein.

343.    Plaintiffs and the California Subclass seek damages, injunctive relief, and other and further relief as the Court may deem just and proper.

**TENTH CAUSE OF ACTION**

**Violation of the California Consumer Privacy Act**
**Cal. Civ. Code §§ 1798.150 *et seq.* ("CCPA")**
**(On Behalf of Plaintiffs Jane Doe, Jane Doe 2, Jane Doe 3, Jane Doe 20**
**and the California Subclass Against Defendant Tea)**

344.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

345.    This claim is pleaded on behalf of Plaintiffs Jane Doe, Jane Doe 2, Jane Doe 3, and Jane Doe 20 ("Plaintiffs" for the purposes of this cause of action) and the California Subclass.

346.    In 2018, the California Legislature passed the CCPA, giving consumers broad protections and rights intended to safeguard their personal information. Among other things, the CCPA imposes an affirmative duty on certain businesses that maintain personal information about California residents to implement and maintain reasonable security procedures and practices that are appropriate to the nature of the information collected.

347.    Defendant Tea is subject to the CCPA and failed to implement such procedures which resulted in the Data Breach.

348.    Section 1798.150(a)(1) of the CCPA provides: "Any consumer whose nonencrypted or nonredacted personal information, as defined [by the CCPA] is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business' violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for" statutory or actual damages, injunctive or declaratory relief, and any other relief the court deems proper.

349.    Plaintiffs are "consumers" as defined by Civ. Code § 1798.140(g).

350.    Defendant Tea is a "business" as defined by Civ. Code § 1798.140(c) because it is a corporation that does business in the state of California and has annual revenues of in excess of $25,000,000.

351.    Plaintiffs' name in combination and other sensitive PII compromised in the Data Breach constitutes "personal information" within the meaning of the CCPA. *See* Civ. Code § 1798.150(a)(1).

352.    Through the Data Breach, Plaintiffs' PII was accessed without authorization, exfiltrated, and stolen by criminals in a nonencrypted and/or nonredacted format.

353.    The Data Breach occurred as a result of Defendant's failure to implement and maintain reasonable security procedures and practices appropriate to the nature of the information.

354.    In accordance with Cal. Civ. Code § 1798.150(b)(1), prior to the filing of this Complaint, Plaintiffs' counsel served Defendant Tea with notice of these CCPA violations by certified mail, return receipt requested. The parties are currently negotiating a limited protective order regarding the disclosure of Plaintiffs' legal names. Once that process is resolved, if Defendant Tea fails to respond to Plaintiffs' notice letter or agree to rectify the violations detailed above and give notice to all affected consumers within 30 days of the date of written notice, Plaintiffs also will seek actual, punitive, and statutory damages, restitution, attorneys' fees and costs, and any other relief the Court deems proper as a result of Defendant Tea's CCPA violations.

## ELEVENTH CAUSE OF ACTION

**Violation of New York General Business Law § 349**
**(On Behalf of Plaintiff Jane Doe 11**
**and the New York Subclass Against Defendant Tea)**

355.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

356.    This claim is pleaded on behalf of Plaintiff Jane Doe 11 ("Plaintiff" for the purposes of this cause of action) and the New York Subclass.

357.    Section 349 of the New York GBL provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." N.Y. Gen. Bus. Law § 349(a).

358.    Defendant Tea, while operating in New York, engaged in deceptive acts and practices in the conduct of business, trade and commerce, and the furnishing of services, in violation of N.Y. Gen. Bus. Law § 349(a). This includes but is not limited to the following:

   a.   disclosing Plaintiff's and New York Subclass Members' PII;

   b.   failing to enact adequate privacy and security measures and/or policies to protect Plaintiff's and the New York Subclass Members' PII from unauthorized disclosure, release, and theft;

   c.   failing to take proper action following known security risks and prior cybersecurity incidents; and

AMENDED CLASS ACTION COMPLAINT

d.  failing to disclose the Data Breach to the victims in a timely and accurate manner, in violation of the duties imposed by, *inter alia*, N.Y. Gen Bus. Law § 899-aa(2).

359.  As a direct and proximate result of Defendant Tea's practices, including the Data Breach, Plaintiff and other New York Subclass Members suffered injury and/or damages, including but not limited to misuse of their PII, potential identity theft, and threats of future violence and harassment.

360.  The above unfair and deceptive practices and acts by Defendant Tea were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and other New York Subclass Members that they could not reasonably avoid, and which outweighed any benefits to consumers or to competition.

361.  Defendant Tea knew or should have known that its systems, policies, and data security practices were inadequate to safeguard PII entrusted to it, and that risk of fraudsters obtaining the PII was highly likely.

362.  Defendant Tea's actions in engaging in the above-named unfair practices and deceptive acts, including the Data Breach, were negligent, knowing and willful.

363.  Plaintiff and New York Subclass Members seek relief under N.Y. Gen. Bus. Law § 349(h), including but not limited to actual damages (to be proven at trial), treble damages, statutory damages, injunctive relief, and/or attorney's fees and costs.

364.  Plaintiff and New York Subclass Members seek to enjoin such unlawful deceptive acts and practices described above. Each New York Subclass Member will be irreparably harmed unless the Court enjoins Defendant Tea's unlawful, deceptive actions, in that Defendant will continue to fail to protect PII entrusted to them, as detailed herein.

365.  Plaintiff and New York Subclass Members seek declaratory relief, restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues and/or profits, injunctive relief prohibiting Defendant Tea from continuing to disseminate its false and misleading statements, and other relief allowable under N.Y. Gen. Bus. Law § 349.

AMENDED CLASS ACTION COMPLAINT

**TWELFTH CAUSE OF ACTION**

**Violations of Illinois Consumer Fraud and Deceptive Business Practices Act
815 Ill. Comp. Stat. §§ 505 *et seq*. ("ICFA")
(On Behalf of Jane Doe 6, Jane Doe 7, Jane Doe 8, Jane Doe 9, Jane Doe 10,
and the Illinois Subclass Against Defendant Tea)**

366.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

367.    This claim is pleaded on behalf of Plaintiffs Jane Doe 6, Jane Doe 7, Jane Doe 8, Jane Doe 9, and Jane Doe 10 ("Plaintiffs" for the purposes of this cause of action) and the Illinois Subclass.

368.    The ICFA makes unlawful certain acts by persons in the conduct of trade or commerce. 815 Ill. Comp. Stat. § 505/2. Violating the Illinois Personal Information Protection Act ("IPIPA"), 815 Ill. Comp. Stat. 530/1, *et seq*., is one such unlawful act. 815 Ill. Comp. Stat. 530/20.

369.    The IPIPA requires "[a]ny data collector that owns or licenses personal information concerning an Illinois resident" to provide notice to the resident expediently and without unreasonable delay "that there has been a breach of the security of the system data following discovery or notification of the breach." 815 Ill. Comp. Stat. § 530/10.

370.    Defendant Tea is a data collector that "handles, collects, disseminates, or otherwise deals with nonpublic personal information" of Illinois's residents, as defined by the IPIPA. 815 Ill. Comp. Stat. 530/5.

371.    The IPIPA requires data collectors like Defendant Tea that own or maintain "records that contain personal information concerning an Illinois resident" to "implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification, or disclosure." 815 Ill. Comp. Stat. § 530/45. Defendant Tea failed to implement and maintain reasonable security measures as required by the statute.

372.    Specifically, Defendant Tea collected and stored Plaintiffs' and the Illinois Subclass's PII. Defendants stored the PII in a knowingly unsafe and unsecured manner by, among other things, failing to dispose of data no longer needed for any legitimate business purpose, maintaining the data on an unsecured database in an unencrypted format, and failing to adequately monitor activity on the servers containing Plaintiffs' and the Illinois Subclass's PII.

AMENDED CLASS ACTION COMPLAINT

373.    Similarly, Defendant Tea deployed knowingly unreasonable data security measures that defied expert recommendations, industry standards, and statutory requirements for reasonable data security, including by, but not limited to:

    a.   Failing to implement and maintain reasonable technical and administrative information security controls to safeguard Illinois Subclass members' PII.

    b.   Inadequately monitoring the security of their networks and systems.

    c.   Allowing unauthorized access to Illinois Subclass members' PII.

    d.   Failing to promptly detect that Illinois Subclass members' PII had been compromised.

    e.   Neglecting to remove PII that was no longer required to be retained according to regulations.

    f.   Failing to promptly and adequately inform Illinois Subclass members about the occurrence and extent of the Data Breach, preventing them from taking appropriate measures to mitigate the risk of identity theft and other damages.

374.    Consequently, Defendant Tea took actions in violation of the IPIPA that caused substantial harm to Plaintiffs and the Illinois Subclass members. That is especially true because, despite failing to reasonably protect Plaintiffs' and the Illinois Subclass's highly sensitive PII, upon information and belief, Defendant Tea gained significant profit from that PII.

375.    Plaintiffs' and the Illinois Subclass's highly sensitive PII was put at foreseeable risk of unauthorized access, theft, and acquisition. That risk materialized with the Data Breach.

376.    Due to Defendant Tea's inadequate security, the resulting Data Breach, and the unreasonably delayed notice, Plaintiffs and members of the Illinois Subclass have been injured by, among other things; (1) the exposure of their PII, including identification information such as home addresses, to online threat actors; (2) the loss of the ability to control how their PII is used; (3) compromise, publication and/or theft of Plaintiffs' and Illinois Subclass Members' PII; (4) out-of-pocket costs associated with the prevention, detection and recovery from identity theft and/or unauthorized use of financial and medical accounts; (5) lost opportunity costs associated with their efforts expended and the loss of productivity from addressing as well as attempting to mitigate the actual and future consequences of the Data Breach including, but not limited to, efforts spent researching how to prevent, detect, and recover from PII misuse;

(6) costs associated with the ability to use credit and assets frozen or flagged due to credit misuse, including complete credit denial and/or increased cost of the use, the use of credit, credit scores, credit reports, and assets; (7) continued risks to their PII, which remains in Defendant Tea's possession and may be subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its possession; and (8) future costs in terms of time, effort and money that will be spent trying to prevent, detect, contest and repair the effects of the PII compromised as a result of the Data Breach as a remainder of the Plaintiffs' and Illinois Subclass Members' lives.

377.    Plaintiffs and the Illinois Subclass also remain at heightened risk of future injury because their PII still resides with Defendant Tea. Without the use of adequate data security, Plaintiffs and the Illinois Subclass remain at a heightened and substantial risk that their PII will be subject to further exposure.

378.    Plaintiffs and the Illinois Subclass seek all monetary and non-monetary relief allowed by law, including any: economic damages; damages for emotional and mental anguish; nominal damages; enhanced or treble damages available under the law; court costs; reasonable and necessary attorneys' fees; injunctive relief; and any other relief available by law and to which the court deems proper.

## THIRTEENTH CAUSE OF ACTION

**Violations of North Carolina Unfair and Deceptive Trade Practices Act**
**N.C. Gen. Stat. § 75.1.1 et seq. ("NCUDTPA")**
**(On Behalf of Plaintiff Jane Doe 12, Jane Doe 13, Jane Doe 14,**
**and the North Carolina Subclass Against Defendant Tea)**

379.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

380.    This claim is pleaded on behalf of Plaintiffs Jane Doe 12, Jane Doe 13, and Jane Doe 14 ("Plaintiffs" for the purposes of this cause of action) and the North Carolina Subclass.

381.    The NCUDTPA provides that "[u]nfair methods of competition in or affecting commerce, and unfair . . . acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. Ann. § 75-1.1.

382.    "[U]nfair methods of competition" is interpreted broadly to include acts that violate other laws and may include acts even if not specifically proscribed by some other law.

383.    Defendant Tea advertised, offered, or sold goods or services in North Carolina and engaged in trade or commerce directly or indirectly affecting the people of North Carolina, as defined by N.C. Gen. Stat. Ann. § 75-1.1(b).

384.    Specifically, Defendant Tea collected and stored Plaintiffs' and the North Carolina Subclass's PII. Defendant Tea stored the PII in a knowingly unsafe and unsecured manner by, among other things, failing to dispose of data no longer needed for any legitimate business purpose, maintaining the data on an unsecured database in an unencrypted format, failing to adequately monitor activity on the servers containing Plaintiffs' and the North Carolina Subclass's information, and failing to adequately segment the sensitive data from other parts of Defendant's servers and networks. Similarly, Defendant Tea deployed knowingly unreasonable data security measures that defied expert recommendations, industry standards, and statutory requirements for reasonable data security, including by, but not limited to:

a. Failing to implement and maintain reasonable technical and administrative information security controls to safeguard North Carolina Subclass members' PII.

b. Inadequately monitoring the security of their networks and systems.

c. Allowing unauthorized access to North Carolina Subclass members' PII.

d. Failing to promptly detect that North Carolina Subclass members' PII had been compromised.

e. Neglecting to remove PII that was no longer required to be retained according to regulations.

f. Failing to promptly and adequately inform North Carolina Subclass members about the occurrence and extent of the Data Breach, preventing them from taking appropriate measures to mitigate the risk of identity theft and other damages.

385.    Consequently, Defendant Tea took actions in violation of the NCUDTPA that caused substantial harm to Plaintiffs and the North Carolina Subclass members. That is especially true because, despite failing to reasonably protect Plaintiffs' and the North Carolina Subclass's highly sensitive PII, upon information and belief, Defendant gained significant profit from that PII. While Defendant Tea

profited from Plaintiffs' and the North Carolina Subclass's PII, it failed to take the necessary measures to protect it, leaving Plaintiffs and the North Carolina Subclass at significant and foreseeable risk of harm.

386.    Due to Defendant Tea's inadequate security, the resulting Data Breach, and the unreasonably delayed notice, Plaintiffs and members of the North Carolina Subclass have been injured by, among other things; (1) the exposure of their PII, including identification information such as home addresses, to online threat actors; (2) the loss of the ability to control how their PII is used; (3) compromise, publication and/or theft of Plaintiffs' and North Carolina Subclass Members' PII; (4) out-of-pocket costs associated with the prevention, detection and recovery from identity theft and/or unauthorized use of financial and medical accounts; (5) lost opportunity costs associated with their efforts expended and the loss of productivity from addressing as well as attempting to mitigate the actual and future consequences of the Data Breach including, but not limited to, efforts spent researching how to prevent, detect, and recover from PII misuse; (6) costs associated with the ability to use credit and assets frozen or flagged due to credit misuse, including complete credit denial and/or increased cost of the use, the use of credit, credit scores, credit reports, and assets; (7) continued risks to their PII, which remains in Defendant Tea's possession and may be subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its possession; and (8) future costs in terms of time, effort and money that will be spent trying to prevent, detect, contest and repair the effects of the PII compromised as a result of the Data Breach as a remainder of the Plaintiffs' and North Carolina Subclass Members' lives.

387.    Plaintiffs and the North Carolina Subclass also remain at heightened risk of future injury because their information resides with Defendant Tea. Without the use of adequate data security, Plaintiffs and the North Carolina Subclass remain at a heightened and substantial risk that their PII will be subject to further exposure.

388.    Plaintiffs and the North Carolina Subclass seek all monetary and non-monetary relief allowed by law, including any: economic damages; damages for emotional and mental anguish; nominal damages; enhanced or treble damages available under the law; court costs; reasonable and necessary attorneys' fees; injunctive relief; and any other relief available by law and to which the court deems proper.

## FOURTEENTH CAUSE OF ACTION

### Violations of North Carolina Identity Theft Protection Act
### N.C. Gen. Stat. § 75-60 *et seq*.
### (On Behalf of Plaintiff Jane Doe 12, Jane Doe 13, Jane Doe 14,
### and the North Carolina Subclass Against Defendant Tea)

389. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

390. This claim is pleaded on behalf of Plaintiffs Jane Doe 12, Jane Doe 13, and Jane Doe 14 ("Plaintiffs" for the purposes of this cause of action) and the North Carolina Subclass.

391. In pertinent part, N.C. Gen. Stat. § 75-65 provides:

> Any business that owns or licenses Private Information of residents of North Carolina or any business that conducts business in North Carolina that owns or licenses Private Information in any form (whether computerized, paper, or otherwise) shall provide notice to the affected person that there has been a security breach following discovery or notification of the breach. The disclosure notification shall be made without unreasonable delay, consistent with the legitimate needs of law enforcement, as provided in subsection (c) of this section, and consistent with any measures necessary to determine sufficient contact information, determine the scope of the breach and restore the reasonable integrity, security, and confidentiality of the data system.

392. N.C. Gen. Stat. § 14-113.20b defines Private Information as a person's first name or initial and last name in combination with and linked to any one or more of the following data elements that relate to a resident of this State:

    a. Social security or employer taxpayer identification numbers, N.C. Gen. Stat. § 14-113.20(b)(1);

    b. Driver's license, State identification card, or passport numbers, N.C. Gen. Stat. § 14-113.20(b)(2);

    c. Personal Identification Code, electronic identification numbers, electronic mail names or addresses, Internet account numbers, or Internet identification names, digital signatures, N.C. Gen. Stat. § 14-113.20(b)(7)-(9);

    d. "any other numbers or information that can be used to access a person's financial resources," N.C. Gen. Stat. § 14-113.20(b)(10); or

    e. biometric data, fingerprints, passwords, legal surname prior to marriage, N.C. Gen. Stat. § 14-113.20(b)(11)-(14).

- 73 -

393.    Defendant Tea owns, licenses and/or maintains computerized data that includes Plaintiffs' and North Carolina Subclass Members' PII.

394.    Defendant Tea's conduct, as alleged herein, violated the Identity Theft Protection Act of North Carolina, N.C. Gen. Stat. § 75-60.

395.    Defendant Tea was required, but failed, to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the cyber security incident described herein.

396.    The Data Breach constituted a "Security breach" within the meaning of N.C. Gen. Stat. § 75-60.

397.    The information compromised in the Data Breach constituted "personal identifying information" within the meaning of N.C. Gen. Stat. § 75-60.

398.    Defendant Tea violated N.C. Gen. Stat. § 75-60 by unreasonably delaying disclosure of the Data Breach to Plaintiffs and North Carolina Subclass members, whose personal identifying information was acquired by an unauthorized person.

399.    Specifically, Defendant Tea collected and stored Plaintiffs' and the North Carolina Subclass's PII. Defendant Tea stored the PII in a knowingly unsafe and unsecured manner by, among other things, failing to dispose of data no longer needed for any legitimate business purpose, maintaining the data on an unsecured database in an unencrypted format, and failing to adequately monitor activity on the servers containing Plaintiffs' and the North Carolina Subclass's information.

400.    Defendant Tea's failure to comply with basic data security necessary to protect any stored data, much less the significant PII it stored, constitutes immoral, unethical, oppressive, and unscrupulous conduct that caused substantial harm to thousands of women. That is especially true because, despite failing to reasonably protect Plaintiffs' and the North Carolina Subclass's highly sensitive PII, upon information and belief, Defendant gained significant profit from that information. While Defendant profited from Plaintiffs' and the North Carolina Subclass's data, it failed to take the necessary measures to protect it, leaving Plaintiffs' and the North Carolina Subclass at significant and foreseeable risk of harm.

401.    Consequently, Defendant Tea took actions in violation of the Identity Theft Protection Act of North Carolina.

402.     As a result of those unlawful and unfair business practices, Plaintiffs' and the North Carolina Subclass's PII was put at foreseeable risk of unauthorized access, theft, and acquisition. That risk materialized with the Data Breach.

403.     Due to Defendant Tea's inadequate security, the resulting Data Breach, and the unreasonably delayed notice, Plaintiffs and members of the North Carolina Subclass have been injured by, among other things; (1) the exposure of their PII, including identification information such as home addresses, to online threat actors; (2) the loss of the ability to control how their PII is used; (3) compromise, publication and/or theft of Plaintiffs' and North Carolina Subclass Members' PII; (4) out-of-pocket costs associated with the prevention, detection and recovery from identity theft and/or unauthorized use of financial and medical accounts; (5) lost opportunity costs associated with their efforts expended and the loss of productivity from addressing as well as attempting to mitigate the actual and future consequences of the Data Breach including, but not limited to, efforts spent researching how to prevent, detect, and recover from PII misuse; (6) costs associated with the ability to use credit and assets frozen or flagged due to credit misuse, including complete credit denial and/or increased cost of the use, the use of credit, credit scores, credit reports, and assets; (7) continued risks to their PII, which remains in Defendant Tea's possession and may be subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its possession; and (8) future costs in terms of time, effort and money that will be spent trying to prevent, detect, contest and repair the effects of the PII compromised as a result of the Data Breach as a remainder of the Plaintiffs' and North Carolina Subclass Members' lives.

404.     Plaintiffs and the North Carolina Subclass also remain at heightened risk of future injury because their information resides with Defendant Tea. Without the use of adequate data security, Plaintiffs and the North Carolina Subclass remain at a heightened and substantial risk that their PII will be subject to further exposure.

405.     Plaintiffs and the North Carolina Subclass seek all monetary and non-monetary relief allowed by law, including any: economic damages; damages for emotional and mental anguish; nominal damages; enhanced or treble damages available under the law; court costs; reasonable and necessary attorneys' fees; injunctive relief; and any other relief available by law and to which the court deems proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment on behalf of themselves and the classes as follows:

a.    Certifying that the action may be maintained as a class action, certifying the classes, and appointing Plaintiffs class representatives and the undersigned counsel as class counsel to represent the putative classes;

b.    Awarding Plaintiffs and the classes appropriate relief, including actual damages, compensatory damages, and punitive damages, as allowed by law;

c.    Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiffs and the classes;

d.    Awarding minimum statutory damages of $2,500 for each violation of the DPPA;

e.    Awarding injunctive relief as necessary to protect the interests of Plaintiffs and the classes;

f.    Awarding Plaintiffs and the classes prejudgment and post-judgment interest;

g.    Awarding Plaintiffs and the classes their attorneys' fees and costs, as allowable by law; and

h.    Awarding such other and further relief as the Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs, individually and on behalf of the classes, demand a trial by jury as to all issues triable of right.

DATED: September 23, 2025                    Respectfully submitted,

*/s/ Tina Wolfson*
Tina Wolfson (SBN 174806)
*twolfson@ahdootwolfson.com*
Theodore W. Maya (SBN 223242)
*tmaya@ahdootwolfson.com*
Deborah De Villa (SBN 312564)
*ddevilla@ahdootwolfson.com*
Alyssa D. Brown (SBN 301313)
*abrown@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, California 91505
Tel. (310) 474.9111
Fax: (310) 474.8585

Melissa Clark (*pro hac vice* forthcoming)
mclark@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
521 5th Avenue, 17th Floor
New York, NY 10175
Tel: (917) 336-0171
Fax: (917) 336-0177

*Counsel for Plaintiffs and the Proposed Classes*

AMENDED CLASS ACTION COMPLAINT