1

**BAKER & HOSTETLER LLP**
Bethany G. Lukitsch (SBN 314376)

2  Kamran B. Ahmadian (SBN 314566)
Alexis Cruz (SBN 312842)

3  1900 Avenue of the Stars | Suite 2700
Los Angeles, CA 90067-4508

4  Telephone:  310.820.8800
Facsimile:  310.820.8859

5  Email:      *blukitsch@bakerlaw.com*
            *kahmadian@bakerlaw.com*

6            *acruz@bakerlaw.com*

7  *Attorneys for Defendant*
TEA DATING ADVICE, INC.

8

9

10                **UNITED STATES DISTRICT COURT**

11                **NORTHERN DISTRICT OF CALIFORNIA**

12  IN RE: TEA DATING ADVICE DATA          Case No. 3:25-cv-06321-WHO
    BREACH LITIGATION

13                                          *[Assigned to Hon. William H. Orrick]*

14  This Document Relates to: All Actions   **DECLARATION OF KAMRAN B.**
                                            **AHMADIAN IN SUPPORT OF**

15                                          **[PROPOSED] STIPULATED ORDER RE:**
                                            **DISCOVERY OF ELECTRONICALLY**

16                                          **STORED INFORMATION**

17

18

19

20

21

22

23

24

25

26

27

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

## DECLARATION OF KAMRAN B. AHMADIAN

I, Kamran B. Ahmadian,

1.      I am an attorney licensed, authorized, and admitted to practice law before this Court and the federal and state courts of the State of California.  I am a partner at the law firm of Baker & Hostetler, LLP, counsel of record for Defendant Tea Dating Advice Inc. ("Defendant" or "Tea") in the above-captioned litigation and, in that capacity, make this declaration.  I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would testify competently thereto.

2.      I submit this declaration pursuant to Paragraph 5 of this Court's Standing Order to demonstrate that good cause exists to depart from the Northern District of California's Model Order for Plaintiffs Jane Doe, *et al.* and Tea's Stipulated Order Re: Discovery of Electronically Stored Information.

3.      Attached hereto as **Exhibit A** is a redline version comparing the proposed Stipulated Order Re: Discovery of Electronically Stored Information with the Model Order.

4.      Good cause exists to depart from the Northern District of California's Model Order because additional precautions must be taken to protect the (1) Tea systems, technology, and procedures/protocols at issue in this case, and (2) identity and information of Plaintiffs, who are appearing under pseudonyms.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct.  Executed on February 5, 2026 in Los Angeles, California.


By: _/s/ Kamran B. Ahmadian_
      Kamran B. Ahmadian

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

# Exhibit A

1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

8
9
10
11
12
13
14
15

|  |  |
|---|---|
| | ) Case Number: C xx-xxxx |
| | ) |
| | ) [MODEL] STIPULATION & ORDER RE: |
| | ) DISCOVERY OF ELECTRONICALLY |
| Plaintiff(s), | ) STORED INFORMATION FOR PATENT |
| | ) LITIGATION |
| vs. | ) |
| | ) |
| | ) |
| | ) |
| Defendant(s). | ) |
| | ) |

Upon the stipulation of the parties, the Court ORDERS as follows:

IN RE: TEA DATING ADVICE DATA BREACH LITIGATION

This Document Relates to: All Actions

Case No.: 3:25-cv-06321-WHO

**[PROPOSED] STIPULATED ORDER RE: DISCOVERY OF ELECTRONICALLY STORED INFORMATION**

16
17
18
19
20
21

22    1. This Order supplements all other discovery rules and orders. It streamlines Electronically Stored

23    Information ("ESI") production to promote a "just, speedy, and inexpensive determination of this

24    action, as required by Federal Rule of Civil Procedure 1."

25
26
27
28

**1.    PURPOSE**

Plaintiffs and Defendant Tea Dating Advice, Inc. ("Tea"), by and through their counsel of record, hereby agree to this Stipulated Protocol for Production of Electronically Stored Information ("ESI Protocol") in the above-captioned action (the "Action") as a supplement to the Federal Rules of Civil Procedure and any other applicable orders and rules.

**2.    COOPERATION**

The parties are aware of the importance the Court places on cooperation and commit to cooperate in good faith throughout the matter.

**3.    DEFINITIONS**

(a)    "Parties" shall collectively mean all named parties to any proceeding in the Action, including any party added or joined to any complaint in the Action, as well as named parties to actions that may be consolidated into or coordinated with the Action.

(b)    "Producing Party" shall mean any Party or third-Party to this Action who produces documents or ESI pursuant to any discovery request, subpoena, or otherwise.

(c)    "Receiving Party" shall mean a Party or third-Party to this Action who receives documents or ESI from a Producing Party in response to a discovery request, subpoena, or otherwise.

**4.    LIAISON**

The Parties each have identified or will identify e-discovery liaisons who are and will be knowledgeable about and responsible for discussing their respective electronically stored information ("ESI"). Each e-discovery liaison will be, or have access to those who are, knowledgeable about the technical aspects of e-discovery, including the location, nature, accessibility, format, collection, search methodologies, and production of ESI in this matter. The Parties will rely on the e-discovery liaisons, as needed, to confer about ESI and to help resolve disputes without court intervention.

**5.    PRESERVATION**

The Parties have discussed their preservation obligations and needs, and agreed that preservation of potentially relevant ESI will be reasonable and proportionate.

(a)    Counsel for Plaintiffs has advised that Plaintiffs have been instructed on their preservation obligations.

(b)    Counsel for Tea has advised that Tea has been instructed on its preservation obligations.

**6.    SEARCH/CULLING**

(a)    *Duty to Meet and Confer*. The Parties recognize that there exist a variety of search tools and methodologies that can be used in advance of producing documents, including, but not limited to, the use of search terms and technology assisted review ("TAR") tools. The Parties will meet and confer and attempt in good faith to reach agreement regarding the following: (i) the identity of custodians who may have discoverable ESI; (ii) the number of and which custodians from whom ESI should be searched; and (iii) the search terms, phrases, or parameters to be used in searching databases for responsive ESI, if any, and criteria for evaluating and accepting the results of the such terms, phrases, and parameters; and (iv) if TAR is to be used, the parameters of the TAR model, including any search terms, email threading, or other filtering methods applied before or after TAR, and criteria for evaluating and accepting the results of the TAR model. For the avoidance of any doubt, a Producing Party is at liberty to use any methodology and tool for the purpose of prioritization and/or expediting the review, so long as no documents are removed from attorney review or production based on such methodology.

(b)    *Custodians and ESI Categories*. By February 19, 2026, unless otherwise agreed by the Parties in writing, the Parties will exchange in writing, for their respective side: (a) the types of ESI they believe should be preserved; (b) a list of custodians and their job titles and dates of employment, or descriptions of custodians, likely to have relevant ESI; (c) a list of non-custodial document sources likely to contain relevant information if available at this time. The Producing Party may supplement this list at any time prior to close of discovery; (d) a general description of the default time periods for preservation for the categories of data in (a); and (e) a description of any potentially relevant ESI data sources that the Party is aware of having been lost or destroyed, and a description of the circumstances

of such loss or destruction. The Parties shall add or remove custodians previously agreed to as reasonably necessary, upon disclosure to and conferral with one another.

(b)      *Search Terms & Locations*. Where search terms will be used to cull potentially responsive ESI (i.e., exclude ESI from review on a systemic or mass basis to reduce volume), the Parties agree that the Producing Party will investigate what search terms and source files will be reasonably likely to uncover responsive information and then propose those search terms and locations for the Receiving Party's consideration. Specifically, a Producing Party shall disclose the custodians or other non-custodial sources, date range, and search terms or queries, if any, and methodology that it proposes to use to locate ESI likely to contain discoverable information. Proposed search terms will be subject to an iterative and cooperative conferral process among the Parties. If the Producing Party disputes any terms suggested by the Requesting Party, the Producing Party will provide information regarding search methodology, including but not limited to, production of search term hit reports, with unique document "hit" counts (i.e., documents that do not hit on other search terms or queries and that have been de-duped within the set). The Parties will confer about the provision of other qualitative or quantitative information to facilitate the evaluation or modification of the disputed search terms.

The Parties will reach an agreement on the search terms or queries to be used. If any search terms are in dispute, the Producing Party shall proceed with collection, review, and production of documents identified by the agreed-upon search terms while the Parties work in good faith to resolve the remaining disputes.

Such search terms may be reasonably supplemented during discovery upon request of the Receiving Party.

(c)      *Reasonable Search/Discrete Collections.* Agreement on a search methodology does not relieve a Party of its obligation under the Federal Rules of Civil Procedure to conduct a reasonable search and produce all relevant and responsive documents of which a Party is aware, regardless of whether they contain agreed-upon search terms or are responsive to any other search methodology agreed to by the Parties or ordered by the Court. To the extent a Party is aware of non-duplicative documents that are relevant, responsive, non-privileged, and reasonably accessible, such documents

will be produced regardless of whether they contain search terms or are responsive to any other search methodology agreed to by the Parties or ordered by the Court. Those portions of a Party's documents that represent discrete document collections, such as substantially relevant folders of ESI specifically segregated by a Party before or after the commencement of this litigation, that are relevant to the claims and defenses in this proceeding, must be reviewed for responsiveness without regard to whether a given document in the collection is responsive to a search term or other permitted search technique.

(d)     *Modification of Search/Additional or Alternate Methodologies.* The Parties acknowledge that there may be subsequent occasions on which potential modification to a previously agreed upon search protocol may be warranted, and/or that it may be appropriate to implement additional or alternate methodologies to identify possibly responsive documents from certain custodians and non-custodial data sources. Should such an instance arise, the Parties agree to meet and confer about modifications to a search methodology. If a Party requests such a meet and confer, the Parties will meet and confer within 10 days.

Nothing in this ESI Protocol waives the right of any Party to petition the Court for an Order modifying its terms upon good cause shown; provided, however, that counsel for such Party must first meet and confer with counsel for the opposing Party, and the Parties shall use reasonable best efforts to negotiate an amendment of this ESI Protocol prior to seeking relief from the Court.

(e)     *Use of Undisclosed Culling Techniques Not Permitted.* Apart from filtering out common system files and application executable files by using a commercially reasonable hash identification process, no software or other technologies will be used to eliminate sources of potentially responsive documents (including via file-type culling, filtering, near de-duplication, etc.) absent disclosure, reasonable conferral, and specific agreement among the Parties.

(g)     *Plaintiffs' Identification and Classification of Documents and ESI.* The Parties shall meet and confer with respect to the identification and classification of Plaintiffs' documents and ESI, but recognize that not all terms of this ESI Protocol will necessarily apply to Plaintiffs.

**7.     PRODUCTION FORMATS**

With the exception of spreadsheets, presentation files (i.e. PowerPoint presentations), PDF files, image files, Multi-Media files, and native files that cannot be converted to image files, the Parties shall produce all relevant, responsive, and non-privileged ESI as Bates-stamped single-page TIFF images with a load file in standard Opticon OPT or iPro LFP or Summation ("DII") format that enables the document to be uploaded and viewed using standard litigation support software in accordance with the provisions below. Unless excepted below, single page, black and white Group IV TIFFs should be provided, at least 300 dots per inch ("DPI") for all documents. Original document orientation should be maintained (i.e., portrait to portrait and landscape to landscape). Where the TIFF image is unreadable or has materially degraded the quality of the original, the Producing Party shall endeavor to provide a higher quality TIFF image or the native or original file.

(a)     *Production Media*. The Parties shall produce documents in an encrypted format through electronic means, such as external hard drives, secure file sharing methods (e.g., FTP), or readily accessible computer or electronic media (e.g., CDs, DVDs) (collectively, "Production Media"), with explicit decryption instructions. Productions shall have the following four directories: (1) IMAGES for the images; (2) DATA for the .dat and .opt files; (3) TEXT for the extracted text/OCR files; and (4) NATIVES for any native Excel or other files that cannot be understood reasonably unless displayed in native format. The Producing Party shall identify: (a) the Producing Party's name; (b) the production date; and (c) the Bates Number range of the materials contained on the Production Media.

(b)     *Color*. Plaintiffs and Tea shall produce documents in color where the document in its original format contained color (e.g., charts and graphics, tracked changes, or other highlights). Color images should be produced with a high quality setting that will not degrade the original image.

(c)     *Unique IDs*. Images shall be produced using a unique file name that will be the Bates number of that page (e.g., ABC000001.TIFF). The Bates number must appear on the face of the image and to the extent practical, not obliterate, conceal, or interfere with any information from the source document. While Bates numbers will not appear on the face of the image for native documents produced, slipsheets shall be provided in accordance with subsection (h).

(d)    *Parent-Child Relationships*. Parent-child relationships (association between an attachment/linked file and its parent document) shall be preserved. The attachment(s)/linked file(s) shall be produced adjacent to the parent document, in terms of Bates numbers, with the first attachment/linked file being named with the next sequential number after the parent, and any additional attachment(s)/linked file(s) sequentially numbered after that first attachment/linked file. E-mail attachments and embedded files or links must contain "BEGATTACH" and "ENDATTACH" fields listing the unique beginning Bates Number of the parent documents and the ending number of the last attachment for each child and parent document. The Parties will make responsiveness and production determinations at the family level, meaning that if any member of a given document family (i.e., parent or attachment) is responsive and contains any non-privileged information, the entire family must be produced.

(e)    *Redactions*. A Party may not redact information on the basis that it believes the information to be irrelevant, and may only redact documents to protect for attorney-client privilege or work product protection, or personally identifiable information irrelevant to the claims and defenses provided it is consistent with the Protective Order to be entered into by the Parties.  This does not preclude the Parties from meeting and conferring in good faith regarding redactions of non-responsive exceptionally sensitive information or similar material where disclosure would raise legitimate privacy, security, or business concerns. If the Parties are redacting information from a page, they shall electronically "burn" the word "Redacted" onto the page or otherwise clearly indicate a redaction at or reasonably near to the location of the redaction(s), along with the basis for such redaction on the face of the document (e.g., "Redacted – Attorney Client Privilege"). The redaction and its basis must also be reflected in the appropriate metadata field.

If documents that the Parties have agreed to produce in native format need to be redacted, the Parties agree to meet and confer in good faith on how to best produce the documents so that proper formatting and usability are maintained; provided, however, the spreadsheet documents that require redaction as permitted under this ESI Protocol shall be redacted on the native file and produced in native format as redacted. Extracted text will not be provided for electronic documents that have been

redacted. Instead, these files should be run through an OCR process to capture the visible text only and the results exchanged in lieu of the original extracted text. Any redactions shall be explained, justified, and included in a privilege log.

(f)     *Confidentiality Designation*. Responsive documents in TIFF format will be stamped with the appropriate confidentiality designations in accordance with the Protective Order entered in this matter. Each responsive document produced in native format will have its confidentiality designation identified in the filename of the native file, indicated on its corresponding TIFF placeholder and/or set forth as a metadata field.

(g)     *Metadata Fields*. Plaintiffs and Tea shall provide the system-generated and metadata fields set forth in **Exhibit A**.

(h)     *Native Format*. The Producing Party shall produce spreadsheets (e.g., Excel, .csv files, Google Sheets, etc.), presentation files (e.g., PowerPoint, Google Slides, etc.), PDF files, personal database files (e.g., MS Access), and any materials not readily convertible to TIFF format (e.g., three-dimensional design files) in native format. To the extent that they are produced in this Action, audio, video, image (e.g., .gif or .jpg) and multimedia files will be produced in native format. If a native file originally had track changes, comments, or other collaborative change features turned on, the .TIF file will display those changes in the converted image file. Native files shall be produced with a link in the NATIVELINK field, along with extracted text (where extracted text is available) and applicable metadata fields set forth in **Exhibit A**. For each native file produced, the production will include a *.tiff image slipsheet indicating the production number of the native file and the confidentiality designation and stating, "File Provided Natively." TIFF images of e-mail messages should include the BCC line. Upon request from the Receiving Party that any files be produced in native format (identified by Bates number), the Parties agree to meet and confer in good faith concerning such requests. A request for such production shall not be unreasonably denied.

(i)     *Text and Chat Messages.* The Parties will collect and produce relevant text and chat messages. When producing text and chat messages (e.g., messages sent via SMS, Teams, Slack, WhatsApp, Signal, iMessage, Google Chat, or other short messaging platforms), the Producing Party

will produce sufficient surrounding context to ensure the message is understandable, and will produce messages in an organized manner so that all messages on a given day (or series of consecutive days) may be reviewed together. The records must be produced with the metadata specified in the "IM/Text/Chat" column in **Exhibit A**, including TXT-THREAD-GROUP (the DOCID of the first conversation day in a given discussion/channel) and TXT-PARTICIPANTS (a list of participant names). The Producing Party will use best available automated solutions to assign full names to participants who are identified only by phone number, email address, handle, or other identifier. If requested by the Receiving Party, the Producing Party agrees to employ reasonable efforts to locate the full names of participants in specific documents identified by the receiving party.

(j)      *Text Files*. For each produced document, a document-level text file shall be provided in addition to the image files (TIFFs). The text of native files should be extracted directly from the native file and each text file will be named using its corresponding beginning bates number (e.g., ABC000001.TXT). For ESI with redacted text, a commercially acceptable technology for Optical Character Recognition ("OCR") shall be used for all scanned, hard copy documents with redactions. To the extent reasonably feasible, extracted text shall provide all comments, tracked changes, speaker's notes, and text from hidden worksheets, slides, columns and rows.

(k)      *Physical/Hard Copy Documents*. Nothing herein shall relieve the Parties of any obligations they may have to search for responsive documents in hard copy form. The Parties shall produce documents that exist solely in physical hard-copy format following this ESI Protocol. The following objective coding fields should be provided, if applicable: (1) beginning Bates number, (2) ending Bates number, (3) page count, and (4) source location/custodian. The documents should be logically unitized for production to the extent reasonably practicable. Where the documents were organized into groups, such as folders, clipped bundles, and binders, this structure shall be maintained and provided in the load file to the extent reasonably practicable. The Parties will make their best efforts to have their vendors unitize documents correctly and will commit to address situations where there are improperly unitized documents. The ".tiff" files shall be subject to an OCR process. The OCR software should maximize text quality over process speed. Settings such as "auto skewing" and

"auto-rotation" should be turned on during the OCR process. The Parties will meet and confer to address instances of undue burden and will work to negotiate an appropriate solution.

(l)    *Databases and Other Structured Data*. The Parties shall meet and confer regarding the production format and scope of data contained in enterprise database or database management systems (e.g., Oracle, SQL server, DB2), including the types of information stored in the database(s) (e.g., fields), the types of reports that can be generated from or for the data, whether there are existing and reasonably available reports that include the information, and whether the Receiving Party will need any information in native form in order to ensure that any information produced is reasonably usable by the Receiving Party and that its production does not impose an undue burden. To facilitate the meet and confer process and production of this information, sample reports reflecting the types of information and fields contained in the database(s) shall not be unreasonably withheld.

(m)    *De-Duplication*. Exact duplicate documents shall be removed based on MD5 or SHA-1 hash values at the family level. Attachments should not be eliminated as duplicates for purposes of production, unless the parent e-mail and all attachments are also duplicates. An e-mail that includes content in the BCC or other blind copy field shall not be treated as a duplicate of an e-mail that does not include identical content in those fields, even if all remaining content in the e-mail is identical. Removal of near-duplicate documents is not acceptable. De-duplication should be performed across the entire collection (global de-duplication) and the CUSTODIAN field should list each custodian, separated by a semi-colon, who was a source of that document. Should the CUSTODIAN metadata field produced become outdated due to rolling productions, an overlay file providing all the custodians for the affected documents should be produced prior to substantial completion of the production.

(n)    *Email Threading*. Email threads are email communications that contain prior or lesser-included email communications that also may exist separately in the Party's electronic document collection. The Parties reserve the right to use email threading to avoid review and production of information contained within an existing email thread in another document being reviewed and produced. Specifically, the producing party will produce all emails individually where the whole family is responsive and non-privileged. When email thread analysis is applied to a family with privilege

redactions, the producing party will produce the top level thread only and produce an excel file with the metadata for all of the underlying individual emails. Participants in lesser-included emails that otherwise would have been subject to review as custodians shall be listed in the most-inclusive email's "All Custodians" field included in the data load file. The receiving party reserves the right to request lesser included emails and production should not be unreasonably withheld.

A most inclusive email thread is one that contains all of the prior or lesser-included emails, including attachments, for that branch of the email thread. For the avoidance of doubt, only email messages for which the parent document and all attachments are contained in the more inclusive email message will be considered less inclusive email messages that need not be produced; if the later message contains different text (such as where the later message adds in-line comments to the body of the earlier message), or does not include an attachment that was part of the earlier message, the earlier message must be produced. Email thread suppression shall not eliminate the ability of the Receiving Party to identify every custodian who had a copy of the produced document or email. Email thread suppression shall also not eliminate the ability of the Receiving Party to see each BCC recipient not shown in the longest unique chain.

(o)    *Embedded Objects*. Non-image files embedded within documents, such as spreadsheets within a PowerPoint, may be extracted as separate documents and treated like attachments to the document in which they were embedded. The Bates number of the source file from which the embedded file is extracted shall be provided as metadata associated with the embedded file, as described in **Exhibit A**. Graphic objects embedded within documents or emails, such as logos, signature blocks, and backgrounds need not be extracted as separate documents.

(p)    *Hidden Data*. The Parties shall process productions in a manner to ensure that all information, to the extent it exists in a document being produced in TIFF, is visible, and to the extent the Producing Party can practicably do so using an automated process, including: auto date (code information should be provided in place of date); tracked changes (the TIFFs should show all tracked changes, comments, deletions, and revision marks, including the identity of the person making the deletion, revision, or comment, and the date and time thereof, in markup form); hidden columns or

rows (noting that hidden columns and/or rows exist in native excel files will be sufficient); hidden text or worksheets; hidden slides or speaker notes in native PowerPoint presentations; or other user-entered data that the source application can display to the user; provided, however, that the Producing Party reserves the right not to produce such documents in TIFF and instead produce such documents in native format if their production in TIFF will be unduly burdensome, and the Receiving Party reserves the right to request the production of such document in TIFF.

(q)     *Ephemeral Messaging*. The Parties acknowledge that certain messaging applications generate communications that are not retained in the ordinary course of business and are automatically deleted pursuant to system design or user-level settings ("ephemeral messaging"). To the extent any such communications were not in existence or were not retained at the time a Party's duty to preserve potentially relevant information arose, such data is not subject to preservation or production unless it is reasonably accessible or recoverable. The Parties will produce responsive, non-privileged ephemeral messaging created after a Party's duty to preserve potentially relevant information arose.

(r)     *Employee Personal Devices*. In the event a Producing Party claims it does not have possession, custody, or control of an employee personal device containing potentially relevant ESI, the Producing Party shall promptly notify the Receiving Party.

(s)     *Proprietary Files*. To the extent a response to discovery requires production of ESI accessible only through proprietary software, the Parties should continue to preserve each version of such information. The Parties shall meet and confer to finalize the appropriate production format.

(t)     *Hyperlinks*. The Producing Party will determine whether hyperlinked documents and modern attachments exist and whether they may contain responsive and relevant information. If they do exist and the Producing Party currently has the technical ability within its own suite of tools to automatically collect internal hyperlinked documents and/or associate them with the linking document, that Party will do so at the time of collection and match internal hyperlinked documents, including those utilizing Google Workspace, Microsoft Office's "Share Documents Via Link" feature, or other document sharing platforms, with the email or familial document to which the documents were attached in native format. Documents extracted from embedded files or hyperlinks shall be populated

with the BEGATTACH and ENDATTACH metadata fields to show the family relationship. If documents cannot be extracted from links at the time of collection, the Parties agree to promptly meet and confer to discuss alternative methods of collection and production, which may include the production of other metadata fields beyond those indicated in **Exhibit A**, such as a metadata field containing the URL used to access a document from a shared document repository, or the manual production of hyperlinked documents, to the extent they are within the Producing Party's possession, custody, or control. The Parties acknowledge that the current version of the hyperlinked document may differ from the version of the document at the time the hyperlink was sent. The Parties also acknowledge that the metadata for producing hyperlinked documents under this section may not reflect the metadata for requested documents at the time the documents were hyperlinked. Where (1) a Producing Party does not at the time of collection have the technical ability to automatically collect hyperlinked documents, or (2) the family relationship cannot be preserved or readily determined automatically by those tools, that party will inform the Receiving Party of this in writing at the time of discovery of the inability to preserve or determine the documents at issue.

The Parties agree to meet and confer in good faith to resolve any disputes concerning the appropriateness of production of the requested documents.

**8.    PRODUCTIONS FROM RELATED PROCEEDINGS AND OTHER LITIGATION**

In the event a Party intends to produce documents that have already been produced in a prior or related matter, the Producing Party shall produce those documents in a way that affixes or includes the same labeling, including Bates labeling, as the previously produced documents, unless otherwise agreed to by the Parties. The Parties also agree to meet and confer regarding other production format issues.

**9.    PRIVILEGE LOG**

If a Party reasonably determines that one or more responsive documents are not discoverable because it is subject to the attorney-client communication privilege or work product doctrine, or another recognized protection or privilege (collectively, the "Privileges" and each a "Privilege"), the Party shall produce a log for each document withheld for privilege from that production no later than

14 days after the production from which the document was withheld. The Parties agree that the logs will be produced in Excel, will be sortable and searchable, and each iteration of the privilege log will be complete, such that it replaces all prior logs. The Parties' respective privilege logs will contain:

1. A unique identifying number for each logged document ad seriatim starting with the number 1 (the "Privilege Log ID" or "Item No.");
2. The Bates number range;
3. Family relationship, if applicable (i.e., whether the document is a parent or attachment);
4. Custodian or source (the name of the person(s) or non-custodial source from which the document was collected);The date the document was prepared and, if different, the date on which it was sent to or shared with persons other than its author;
5. The title and description of the document, including any FILENAME or SUBJECT metadata;
6. The name and job title or capacity of the author, including any AUTHOR or FROM metadata;
7. The name and job title or capacity of each recipient, including any available TO, CC, and BCC metadata;
8. An indication of whether the document has been produced in redacted form or withheld in its entirety;
9. The nature of the privilege or protection asserted (i.e., attorney-client privilege; work product doctrine); A description of the subject matter addressed in the document; and
10. The specific basis for the claim that the document is privileged or protected.

The following documents presumptively need not be included on a privilege log:

11. Communications exclusively between a Party and its outside counsel regarding, and occurring after commencement of, this Action, or in the case of Plaintiffs, occurring after their initial contact with their counsel to discuss this Action;

12. Work product created by outside counsel created after they were contacted by a Party in connection with this Action; and

13. Redacted emails need not be logged as long as the objective metadata (unless the privilege or protection is contained in these fields) is not redacted; the reason for the redaction, including the nature of the privilege asserted, is noted on the face of the document; all senders and recipients of the e-mail are visible; the date the e-mail was sent is visible; and the "Redacted" metadata field is accurately populated. For redacted documents where the subject matter is not decipherable because of the

1   redactions, a description of the contents that is sufficient to understand the subject

2   matter of the document will be supplied on a privilege log.

3       Attorneys or their staff must be identified on the privilege log by an asterisk next to their name

4   and in an accompanying list. Any Party may reasonably dispute a claim of privilege. Prior to seeking

5   Court intervention, the Party disputing, questioning, or otherwise objecting to a claim of privilege or

6   work product shall provide in writing the identification of the documents or category of documents for

7   which it questions the claim of privilege or work product and the reasons for disputing, questioning, or

8   otherwise objecting to the privilege or work product designation. Within 10 days, the Party that

9   designated the documents as privileged or work product protected will provide a written response

10  explaining the basis for its claim or privilege or work product protection, or if applicable,

11  de-designating documents as privileged or work product protected. Thereafter, if the Parties continue to

12  disagree, they will meet and confer in good faith as to the claims of privilege or work product. If

13  agreement has not been reached within 10 days after the commencement of the meet and confer

14  process, any Party may submit the dispute to the Court.

**10.    COSTS**

15      Each Party shall bear its own e-discovery costs, including costs for exemplification and

16  copying.

**11.    MODIFICATION**

18      2. This Order may be modified ~~in the Court's discretion or~~ by stipulation. ~~The parties shall~~

19  ~~jointly submit any proposed modifications within 30 days after the Federal Rule of Civil Procedure 16~~

20  ~~Conference~~ of the Parties or order by the Court for good cause shown.

21      ~~3. As in all cases, costs may be shifted for disproportionate ESI production requests pursuant to~~

22  ~~Federal Rule of Civil Procedure 26. Likewise, a party's nonresponsive or dilatory discovery tactics are~~

23  ~~cost-shifting considerations.~~

24      ~~4. A party's meaningful compliance with this Order and efforts to promote efficiency and~~

25  ~~reduce costs will be considered in cost-shifting determinations.~~

26      ~~5. The parties are expected to comply with the District's E-Discovery Guidelines ("Guidelines")~~

27  ~~and are encouraged to employ the District's Model Stipulated Order Re: the Discovery of~~

28

Electronically Stored Information and Checklist for Rule 26(f) Meet and Confer regarding Electronically Stored Information.

6. General ESI production requests under Federal Rules of Civil Procedure 34 and 45 shall not include email or other forms of electronic correspondence (collectively "email"). To obtain email parties must propound specific email production requests.

7. Email production requests shall only be propounded for specific issues, rather than general discovery of a product or business.

8. Email production requests shall be phased to occur after the parties have exchanged initial disclosures and basic documentation about the patents, the prior art, the accused instrumentalities, and the relevant finances. While this provision does not require the production of such information, the Court encourages prompt and early production of this information to promote efficient and economical streamlining of the case.

9. Email production requests shall identify the custodian, search terms, and time frame. The parties shall cooperate to identify the proper custodians, proper search terms and proper timeframe as set forth in the Guidelines.

10. Each requesting party shall limit its email production requests to a total of five custodians per producing party for all such requests. The parties may jointly agree to modify this limit without the Court's leave. The Court shall consider contested requests for additional custodians, upon showing a distinct need based on the size, complexity, and issues of this specific case. Cost-shifting may be considered as part of any such request.

11. Each requesting party shall limit its email production requests to a total of five search terms per custodian per party. The parties may jointly agree to modify this limit without the Court's leave. The Court shall consider contested requests for additional search terms per custodian, upon showing a distinct need based on the size, complexity, and issues of this specific case. The Court encourages the parties to confer on a process to test the efficacy of the search terms. The search terms shall be narrowly tailored to particular issues. Indiscriminate terms, such as the producing company's name or its product name, are inappropriate unless combined with narrowing search criteria that sufficiently reduce the risk of overproduction. A conjunctive combination of multiple words or phrases (*e.g.*,

"computer" and "system") narrows the search and shall count as a single search term. A disjunctive combination of multiple words or phrases (*e.g.*, "computer" or "system") broadens the search, and thus each word or phrase shall count as a separate search term unless they are variants of the same word. Use of narrowing search criteria (*e.g.*, "and," "but not," "w/x") is encouraged to limit the production and shall be considered when determining whether to shift costs for disproportionate discovery. Should a party serve email production requests with search terms beyond the limits agreed to by the parties or granted by the Court pursuant to this paragraph, this shall be considered in determining whether any party shall bear all reasonable costs caused by such additional discovery.

12. Nothing in this Order prevents the parties from agreeing to use technology assisted review and other techniques insofar as their use improves the efficacy of discovery. Such topics should be discussed pursuant to the District's E-Discovery Guidelines.

**IT IS SO STIPULATED,** through Counsel of Record**THROUGH COUNSEL OF RECORD**.

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

Dated: February 5, 2026                    Respectfully submitted,

Dated:

Counsel for Plaintiff

Dated:

1    ~~Counsel for Defendant~~

2    /s/ Melissa Clark
     Tina Wolfson (SBN 174806)

3    twolfson@ahdootwolfson.com
     Alyssa D. Brown (SBN 301313)

4    abrown@ahdootwolfson.com
     Sarper Unal (SBN 341739)

5    sunal@ahdootwolfson.com

6    **AHDOOT & WOLFSON, PC**
     2600 W. Olive Avenue, Suite 500

7    Burbank, CA 91505
     Telephone: (310) 474-9111

8    Facsimile: (310) 474-8585

9    Melissa Clark (*pro hac vice*)

10   mclark@ahdootwolfson.com
     **AHDOOT & WOLFSON, PC**

11   521 5th Avenue, 17th Floor
     New York, NY 10175

12   Telephone: (917) 336-0171
     Facsimile: (917) 336-0177

13

14   *Interim Lead Counsel for Plaintiffs and the Proposed Class*

15

16   /s/ Kamran B. Ahmadian

17   Bethany G. Lukitsch
     blukitsch@bakerlaw.com

18   Kamran B. Ahmadian
     kahmadian@bakerlaw.com

19   Alexis Cruz

20   acruz@bakerlaw.com
     **BAKER & HOSTETLER LLP**

21   1900 Avenue of the Stars, Suite 2700
     Los Angeles, CA 90067

22   Telephone: (310) 820-8800
     Facsimile: (310) 820-8859

23

24   *Counsel for Defendant* TEA DATING ADVICE, INC.

25

26

27

28

1

## CIVIL LOCAL RULE 5-1(i)(3) ATTESTATION

2

Pursuant to Local Civil Rule 5-1(i)(3), I attest that the consent of this document is acceptable to

3

Melissa Clark, counsel for Plaintiffs, and that I have obtained Ms. Clark's authorization to affix her

4

electronic signature to this document.

5

6

Dated: February 5, 2026                    By:    */s/ Kamran B. Ahmadian*____

7                                                    Kamran B. Ahmadian

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2  **PURSUANT TO STIPULATION, AND FOR GOOD CAUSE SHOWN,** IT IS SO

3  **ORDERED** that the forgoing Agreement is approved.

4

5  Dated: _____    _____

6                                    UNITED STATES DISTRICT/MAGISTRATE JUDGE

7  Dated: _____    _____

8                                    HON. WILLIAM H. ORRICK
                                     UNITED     STATES     DISTRICT     JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**

**Metadata Fields**

With the exception of hard copy paper documents, which are separately addressed in section 7(k), above, each of the metadata and coding fields set forth below that can be extracted shall be produced for each document to the extent reasonably practicable. The parties are not obligated to manually populate any of the fields below if such fields cannot be extracted from a document, with the exception of the following: (a) BEGBATES, (b) ENDBATES, (c) BEGATTACH, (d) ENDATTACH, (e) CUSTODIAN, (f) ALLCUSTODIANS, (g) CONFIDENTIALITY, (h) REDACTION, (i) NATIVELINK, and (j) TEXTLINK, which should be populated by the party or the party's vendor. The parties will make reasonable efforts to ensure that metadata fields automatically extracted from the documents correspond directly to the information that exists in the original documents.

| Field Name[1] | Populated For | Field Description |
|---|---|---|
| BegBates | All | Control Numbers for start of document |
| EndBates | All | Control Numbers for end of document |
| BegAttach | All | Control Numbers (First production Bates number of the first document of the family) |
| EndAttach | All | Control Numbers (Last production Bates number of the last document of the family) |
| Attachment Count | All | Number of attachments |
| Custodian | All | Custodian name (ex. John Doe) |
| CustodianAll | All | All custodians who were in possession of a de-duplicated document besides the individual identified in the Custodian field |
| LogicalPath | All | The directory structure of the original file(s). Any container name is included in the path. For emai0l, this should be the email folder path (e.g., jdoe.pst/inbox |
| AllPaths | All | This field should be populated with the folder paths of all duplicate files (Email and Edocs) that were suppressed during deduplication. |
| Hash value | All | The MD5 or SHA-I hash value |

[1] The Field Names and Descriptions in this ESI Protocol are meant to serve as a guide; the Parties acknowledge that Field Names can vary from system to system and even between different versions of systems.

[PROPOSED] STIPULATED ORDER RE: DISCOVERY OF ELECTRONICALLY STORED INFORMATION
CASE NO.: 3:25-CV-06321-WHO

| PgCount | All | Page Count or an Image Count, if auto generated |
|---------|-----|-------------------------------------------------|
| NativeFile | All | Native File Link |
| EmailSubject | Email | Subject line of email |
| DateSent | Email | Date email was sent |
| TimeSent | Email | Time email was sent |
| DateMod | Email, Edoc | Date the document was modified |
| TimeModified | Email, Edoc | Time the document was modified |
| TimeSent | Email | Time email was sent |
| TimeZoneUsed | Email | Time zone used to process data during document collection and processing |
| ReceiveTime | Email | Time email was received |
| ReceiveDate | Email | Date email was received |
| To | Email | All recipients that were included on the 'To' line of the email |
| From | Email | The name and email address of the sender of the email |
| CC | Email | All recipients that were included on the "CC" line of the email |
| BCC | Email | All recipients that were included on the "BCC" line of the email |
| DateCreated | Edoc | Date the document was created |
| TimeCreated | Edoc | Time the document was created |
| FileName | Email, Edoc | File name of the edoc or email |
| Title | Edoc | Any value populated in the Title field of the document properties |
| Subject | Edoc | Any value populated in the Subject field of the document properties |
| Author | Edoc | Any value populated in the Author field of the document properties |
| DocExt | All | File extension of the document |
| TextPath | All | Relative path to the document level text file |
| Redacted | All | "X," "Y," "Yes," and 'True" are all acceptable indicators that the document is redacted. Otherwise, blank |
| Paper | All | "Y" if document is scanned from hard copy in connection with the collection and production of documents in this matter |
| Confidentiality | All | Populated if document has been designated as "Confidential" or "Highly Confidential" under the Protective Order |
| Production Volume | All | Production Volume Name |
| DocType | All | Description of document (Email, Attachment, EDoc, Hard Copy, etc.) |

| Email Thread ID | Email | Unique identification number that permits threading of email conversations. For instance, unique MS Outlook identification number ("PR_CONVERSATION_INDEX") is 22 bytes in length, followed by zero or more child blocks each 5 bytes in length, that facilitates use of email threading. |
| --- | --- | --- |
| Importance | Email | Notation created for email messages to note a higher level of importance than other email messages added by the email originator |
| FileSize | All | Size of native file, in bytes. |
| SuspectOLE | Edoc | The yes/no indicator of whether a file such as a Microsoft Word document has additional files embedded in it. |
| Comments | Edoc | Comments extracted from the metadata of the native file |
| HasTrackChanges | Edoc | The yes/no indicator of whether the track changes metadata on an Office document is set to True. |
| HiddenText | Edoc | Indication of the existence of hidden document data such as hidden text in a Word document, hidden columns, rows, or worksheets in Excel, or slide notes in PowerPoint. |
| Color | All | Native file contains color – Y/N |
| TXT-THREAD-GROUP | IM/Text/Chat | The DOCID of the first conversation day in a given IM/Text/Chat discussion/channel. |
| TXT-PARTICIPANTS | IM/Text/Chat | A list of participant names in a given IM/Text/Chat discussion/channel. |